Steve W. Berman (*pro hac vice forthcoming*)
Barbara A. Mahoney (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
barbaram@hbsslaw.com

Ben M. Harrington (SBN 313877)
Abby R. Wolf (SBN 313049)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
benh@hbsslaw.com

*Attorneys for Plaintiffs and
the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CHRISTIAN SABOL and SAMANTHIA RUSSELL, on behalf of themselves and all others similarly situated,<br><br>                                    Plaintiffs,<br><br>     v.<br><br>PAYPAL HOLDINGS, INC., a California Corporation, PAYPAL, INC., a California Corporation,<br><br>                                    Defendants. | Case No. 5:23-cv-5100<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

1

**TABLE OF CONTENTS**

2

<u>Page</u>

3    I.      INTRODUCTION ...............................................................................................1

4    II.     JURISDICTION .................................................................................................3

5    III.    VENUE AND DIVISIONAL ASSIGNMENT ...................................................4

6    IV.    PARTIES ...........................................................................................................4

7         A.    Plaintiffs .................................................................................................4

8         B.    Defendants ..............................................................................................5

9    V.     RELEVANT FACTS..........................................................................................5

10       A.    PayPal is the Dominant Digital Payments Platform for eCommerce ........5

11            1.    PayPal Digital Wallets...............................................................6

12            2.    PayPal Payments Gateway .........................................................7

13       B.    Virtually all Online Merchants Agree to PayPal's Anti-Steering
Rules.......................................................................................................9

14

15       C.    PayPal's Anti-Steering Rules Have Several Anticompetitive
Effects...................................................................................................11

16            1.    PayPal's Anti-Steering Rules Prevent eCommerce
Merchants from Competing with Price Discounts That

17                 Would Benefit Consumers. .......................................................11

18            2.    PayPal's Anti-Steering Rules Inflate Gateway Fees and the
Consumer Prices in Which They are Reflected............................12

19

20            3.    PayPal's Anti-Steering Rules Prevent Consumers from
Making Informed Choice Among Payment Alternatives. ............16

21            4.    PayPal's Anti-Steering Rules Reduce Output and
Innovation................................................................................16

22

23       D.    There are No Procompetitive Justifications for the Anti-Steering
Rules.....................................................................................................17

24    VI.    RELEVANT MARKET AND MARKET POWER............................................18

25       A.    The eCommerce Market .......................................................................18

26       B.    The Relevant Geographic Market is the United States. ..........................22

27       C.    Market Power ........................................................................................23

28    VII.   ANTITRUST INJURY....................................................................................23

VIII.   INTERSTATE TRADE AND COMMERCE ........................................................................24

IX.   CLASS ALLEGATIONS ..................................................................................................24

X.   CAUSES OF ACTION.......................................................................................................27

FIRST CAUSE OF ACTION VIOLATION OF SECTION 1 OF THE
   SHERMAN ACT, 15 U.S.C. § 1| (ON BEHALF OF NATIONWIDE
   CLASS) ........................................................................................................................27

SECOND CAUSE OF ACTION  VIOLATION OF CALIFORNIA'S
   CARTWRIGHT ACT,  CAL. BUS. & PROF. CODE § 16700, ET SEQ.
   (ON BEHALF OF THE CALIFORNIA SUBCLASS)........................................................28

THIRD CAUSE OF ACTION  VIOLATION OF CALIFORNIA'S UNFAIR
   COMPETITION LAW,  CAL. BUS. & PROF. CODE § 17200, ET SEQ.
   (ON BEHALF OF THE CALIFORNIA SUBCLASS)........................................................29

JURY DEMAND....................................................................................................................30

Plaintiffs, on their own behalf and on behalf of all others similarly situated, allege as follows:

## I.    INTRODUCTION

1.    PayPal is the dominant eCommerce payments platform in the United States.  More than 400 million consumers have PayPal accounts, including 75 percent of all Americans.  Nearly 1 million eCommerce websites in the United States accept PayPal as a means of payment.  Every day PayPal processes 41 million transactions.

2.    This action concerns anticompetitive agreements between PayPal and all eCommerce merchants that accept PayPal as a method of payment.  The vast majority of eCommerce merchants have entered these agreements, including major retailers such as Home Depot, Best Buy and Kohl's.

3.    To accept PayPal, eCommerce merchants in the United States enter form contracts with PayPal that (since no later than 2010) strictly prohibit offering price discounts when consumers use non-PayPal means of payment.  Accordingly, while PayPal charges merchants the highest transaction fees in the industry (more than 3.5% per eCommerce transaction), PayPal-accepting merchants have agreed by contract that they will not use price incentives to steer consumers away from PayPal to more cost-effective payment solutions.  For example, if a PayPal-accepting merchant sells iPhone 11s for $288.00 when a consumer pays with PayPal, that merchant cannot offer a penny less than $288.00 to consumers who select a more cost-effective payment method to complete the same transaction.

4.    Since at least 2017, PayPal's merchant agreements also prohibit non-price forms of steering consumers toward rival payment methods.  Under the agreements, eCommerce merchants cannot express any preference for other payment options, nor can they prioritize them in their online storefronts or checkout flows.  Merchants must present PayPal as an entirely neutral option when, in fact, the economic consequences of clicking PayPal at checkout are significant and adverse.

5.    These restraints—hereafter "Anti-Steering Rules"—are not the first of their kind.  Visa and MasterCard once imposed similar anti-steering rules on merchants accepting their cards but, after the Justice Department sued the networks for antitrust violations, they agreed in 2010 to

eliminate their anti-steering rules as part of the settlement.[1]  With payments transitioning into the digital realm, PayPal has simply ripped a page right from the Visa and MasterCard playbook.

6.     While PayPal's Anti-Steering Rules have evaded antitrust scrutiny until now, their anticompetitive effects are not difficult to discern.  Without them, merchants could competitively price transactions by the cost of the selected payments platform, allowing consumers to secure discounts at checkout.  These discounts are foreclosed by the Anti-Steering Rules, which essentially fix a price floor for millions of products that eCommerce consumers can obtain with payment methods other than PayPal.

7.     There are other systemic pricing effects.  The Anti-Steering Rules substantially insulate PayPal from normal price competition on the transaction fees they charge.  In a world without the Anti-Steering Rules, eCommerce merchants would be incentivized to steer consumers to PayPal alternatives offering more competitive pricing.  This threat of steering catalyzes competition among payments platforms on price, with each platform vying to be rewarded with additional volume through merchant steering.  When the threat of steering is removed, as per PayPal's Anti-Steering Rules, payments platforms have diminished incentives to compete.  Protected by the Anti-Steering Rules, PayPal, as the dominant platform is incentivized to raise transaction fees above a competitive level, and competing platforms can gain little from undercutting PayPal.  After all, if you are a platform competing with PayPal, why charge significantly less if merchants cannot reward you by steering transactions in your direction?

8.     The result is higher merchant transaction fees across the industry, but it is ultimately everyday eCommerce consumers who pay the price.  One of the reasons merchants routinely accept PayPal's Anti-Steering Rules—beyond PayPal's market dominance—is that, while the rules increase merchants' transaction fees, these fees are baked into prices merchants charge consumers.  In short, merchants do not pay the cost of PayPal's Anti-Steering Rules—consumers do. PayPal has bluntly acknowledged this, informing regulators that "[p]rocessing payments is, like paying rent and hiring

---

[1] *See* U.S. Justice Department, *Justice Department Sues American Express, MasterCard and Visa to Eliminate Rules Restricting Price Competition; Reaches Settlement with Visa and MasterCard* (Oct. 4, 2010), available at: https://www.justice.gov/opa/pr/justice-department-sues-american-express-mastercard-and-visa-eliminate-rules-restricting.

staff, a part of the cost of doing business, and should be absorbed into the final price of goods and services."[2]  Industry observers agree, as does basic economic theory.  Payment processing fees are a variable cost, and when variable costs go up, merchants increase prices to remain profitable.

9.      Higher prices are not the only consumer injury resulting from PayPal's Anti-Steering Rules.  The rules also prevent merchants from conveying the pricing information needed for consumers to make a free and informed choice between payment alternatives.  This, too, is an antitrust injury that fundamentally distorts competition.  Under the Anti-Steering Rules, a PayPal merchant cannot nudge its customers away from PayPal by conveying simple economic facts—for example, that PayPal charges industry-high fees that inflate prices.  By purposefully severing this basic form of signaling, the Anti-Steering Rules leave consumers to choose between payments alternatives with little awareness of the economic repercussions of their selection.  This neutralizes consumers' ability to discipline PayPal's pricing through their purchase decisions.

10.      There are no conceivable pro-competitive justifications for PayPal's Anti-Steering Rules, much less justifications that outweigh the harm.  The rules are a naked restraint on price that serve only to reduce competition.  Consumers like Plaintiffs have been overcharged substantial sums for over a decade.

11.      Plaintiffs bring this action individually and on behalf of a Class of consumers nationwide who transacted with the nearly one million U.S. eCommerce merchants who have agreed to PayPal's Anti-Steering Rules.  Asserting claims under the Sherman Act and state competition laws, Plaintiffs seek damages, injunctive relief, equitable relief, and all other remedies available to redress their injuries.

## II.      JURISDICTION

12.      This Court has federal question jurisdiction pursuant to the federal antitrust laws invoked herein, including the Sherman Act and Clayton Antitrust Act, *e.g.*, 28 U.S.C. § 1331, 28 U.S.C. § 1337(a), and 15 U.S.C. § 15(a).

---

[2] PayPal Submission to Reserve Bank of Australia, available at: https://www.rba.gov.au/payments-and-infrastructure/submissions/submissions-card-surcharging/paypal.pdf (last visited Oct. 4, 2023).

CLASS ACTION COMPLAINT - 3
Case No.: 5:23-cv-5100
011184-11/2352971 V2

13.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from PayPal, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

14.     This Court has personal jurisdiction over PayPal because PayPal has its principal headquarters in San Jose, California, does business in California, directly or through agents, and has sufficient minimum contacts with California such that it has intentionally availed itself of the laws of the United States and California.

### III.     VENUE AND DIVISIONAL ASSIGNMENT

15.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2), and intra-district assignment to the San Jose division of the Court is proper under Local Rule 3-2(d), because a substantial number of the events or omissions giving rise to the claims arose in Santa Clara County, where PayPal is headquartered and conducts business.

### IV.     PARTIES

**A.     Plaintiffs**

16.     Christian Sabol is a resident of Redondo Beach, California. Mr. Sabol regularly shops online on websites like Walmart, eBay, Target, Home Depot, The House Outdoor Gear, REI, Snow Inn, and Next Adventure.  These merchants, and others from whom Mr. Sabol has purchased items online, accept PayPal as a method of online payment and have agreed to PayPal's Anti-Steering Rules.  Mr. Sabol uses credit cards to make online purchases and has never had a PayPal account.

17.     PayPal's Anti-Steering Rules prevented price competition that would have resulted in Mr. Sabol paying lower prices for goods he purchased online. Additionally, because Mr. Sabol regularly shops at merchants that accept PayPal and are subject to the Anti-Steering Rules, he is likely to pay higher prices in the future as a result of PayPal's challenged conduct. Mr. Sabol has been injured and will continue to be injured by paying more for products than he would have paid in the future in the absence of PayPal's unlawful acts, as set forth herein.

18.     Samanthia Russell is a resident of Douglasville, Georgia. She regularly shops online on websites like Best Buy, Walmart, Kohls, and Target.  These merchants, and others from whom

Ms. Russell has purchased items online, accept PayPal as a method of online payment and have agreed to PayPal's Anti-Steering Rules.  Ms. Russell uses credit and debit cards to make online purchases and has not used a PayPal account in at least the last four years.

19.    PayPal's Anti-Steering Rule prevented price competition that would have resulted in Ms. Russell paying lower prices for goods she purchased online. Additionally, because Ms. Russell regularly shops at merchants that accept PayPal and are subject to the Anti-Steering Rules, she is likely to pay higher prices in the future as a result of PayPal's conduct. Ms. Russell has been injured and will continue to be injured by paying more for products than she would have paid in the future in the absence of PayPal's unlawful acts, as set forth herein.

**B.    Defendants**

20.    PayPal Holdings, Inc. is a corporation organized and existing under the laws of Delaware. It holds all assets and liabilities of PayPal, Inc., a subsidiary corporation organized and existing under the laws of Delaware.  PayPal Holdings, Inc. and PayPal, Inc. are collectively referred to here as "PayPal." PayPal transacts business and is headquartered within this judicial district, specifically at 2211 North First Street, San Jose, California 95131.

21.    In addition to operating its own platform, PayPal owns Venmo, which also provides a range of payment services, including a mobile wallet that can be used to make purchases in eCommerce.  The term "PayPal" in this complaint, unless otherwise noted, encompasses Venmo.

## V.    RELEVANT FACTS

**A.    PayPal is the Dominant Digital Payments Platform for eCommerce**

22.    PayPal is the dominant eCommerce payments platform globally and in the United States.  PayPal "connects merchants and consumers with 435 million active accounts."[3]  This includes 400 million consumer accounts and 35 million merchant accounts across 200 markets.[4] PayPal processed more than 22 billion transactions in 2022, with a transaction volume exceeding

---

[3] PayPal Holdings, Inc., 2022 Form 10-K at 5 (Feb. 9, 2023), available at https://www.sec.gov/Archives/edgar/data/1633917/000163391723000033/pypl-20221231.htm.

[4] *Id.*

$1.36 trillion.[5]  For perspective, PayPal's transaction volume (in dollars) for 2022 exceeded the gross domestic product of all but 13 countries in the world.[6]

23.     PayPal has been a mainstay in the online payments industry for more than two decades.  Founded in 1998, PayPal (originally branded as Confinity) gained prominence in the early 2000s as a payments solution for eBay.  eBay ultimately acquired PayPal in 2002 for $1.5 billion and, by the end of 2006, PayPal had more than 100 million end-user accounts.  In 2015, PayPal separated from eBay and once again became a public company.  In 2016, PayPal expanded its operations by acquiring Venmo, a payments platform for both person-to-person payments and eCommerce.[7]

24.     PayPal offers distinct payments products to consumers and merchants.  Two products are particularly relevant here:  (1) PayPal's digital wallets and (2) the PayPal payments gateway.  In essence, PayPal digital wallets are what consumers use to make PayPal payments online, and the PayPal payments gateway is what merchants use to accept them.

25.     As one of the first eCommerce payments platforms to launch and gain traction, PayPal enjoys structural advantages over more recent rival eCommerce payments systems.  Studies show that "PayPal is American users' primary choice for digital payments," with 75% of Americans maintaining a PayPal account.[8]  PayPal has more than 430 million active accounts, more than any other payments platform.[9]

**1.      PayPal Digital Wallets**

26.     PayPal offers consumers both PayPal and Venmo-branded digital wallets (together, "PayPal digital wallets") they can use to purchase goods and services online.  Consumers set up PayPal digital wallets through a web browser or with PayPal's proprietary mobile apps.  The user

---

[5] *Id.* at 7, 38.

[6] *See* https://globalpeoservices.com/top-15-countries-by-gdp-in-2022/.

[7] *See* Kellianne Matthews, *PayPal: Complete Guide. History, Products, Founding, and More*, HISTORY-COMPUTER (updated May 6, 2023), https://history-computer.com/paypal-history/.

[8] *See* Jovana Nikolic Koteska, *PayPal Market Share in 2023 (PayPal Statistics)*, WP-STACK (Dec. 19, 2022), https://blog.wp-stack.co/paypal-market-share/.

[9] *Id.*

can add bank accounts and/or payment cards (credit or debit) to their user profile and, when making online purchases with the wallet, can select which of these underlying accounts to debit. Users can also maintain a balance of funds with PayPal and, upon election, debit that balance to make online purchases.

**2.      PayPal Payments Gateway**

27.      It is easy for eCommerce merchants to accept PayPal and nearly all merchants do. This is accomplished by setting up a PayPal payments "gateway." To do this, merchants generally set up a business account and, once established, they can embed a PayPal checkout button on their online storefront. PayPal advertises that this process takes as little as fifteen minutes.[10] PayPal also offers merchants a more comprehensive payment processing solution that allows them to accept PayPal along with other methods of payment, with PayPal providing various payments processing services.[11] In addition, certain online shopping card software solutions—such as Shopify—allow eCommerce online merchants to accept PayPal.[12]

28.      To reach as many consumers as possible, eCommerce merchants also commonly accept PayPal along with other methods of payment, including payment cards and other digital wallets. Other payment solutions for eCommerce likewise permit merchants to accept PayPal among other forms of payment.

29.      For the consumer, these payment alternatives are typically presented as a menu of options at checkout:

---

[10] *See* https://www.paypal.com/ky/webapps/mpp/accept-payments-online (last visited Oct. 4, 2023).

[11] *See* https://www.paypal.com/us/business/accept-payments/checkout (last visited Oct. 4, 2023).

[12] *See* https://www.paypal.com/ky/webapps/mpp/shopping-cart (last visited Oct. 4, 2023).

30.     PayPal charges merchants a fee ("gateway fee") for transactions processed over its payments gateway.  Currently, that fee is 3.49% of the transaction value plus a fixed fee of $0.49.[13] Competing gateways charge lower transaction fees that generally exceed 2.0% per transaction, plus certain fixed or monthly fees.[14]

31.     Although PayPal charges industry-high fees, eCommerce merchants risk losing transactions if they do not accept PayPal payments, particularly given PayPal's popularity with consumers.  Accordingly, more than 82% of the top 1,000 online retailers, and 940,000 U.S. websites overall, accept PayPal.[15]

---

[13] *See* https://www.paypal.com/us/webapps/mpp/merchant-fees#apm-rates (last visited Oct. 4, 2023).

[14] *See* https://stripe.com/pricing (last visited Oct. 4, 2023); https://www.shopify.com/pricing (last visited Oct. 4, 2023).

[15] Gretchen Salois, *PayPal usage among Top 1000 retailers up 7.3%*, Digital Commerce 360 (Jan 20, 2023), available at: https://www.digitalcommerce360.com/2023/01/20/paypal-usage-among-top-1000-retailers-up-7-3/; *see also* Nikolic Koteska, *supra* note 8.

1

**B.      Virtually all Online Merchants Agree to PayPal's Anti-Steering Rules.**

2        32.      As the dominant eCommerce payments platform with widespread acceptance and a

3   large base of existing consumer accounts, PayPal is able to enforce strict Anti-Steering Rules that

4   harm consumers.

5        33.      The Anti-Steering Rules are set forth in a so-called "user agreement" that U.S.

6   merchants must accept to receive PayPal payments.[16]  Specifically, to open a PayPal account,

7   merchants are directed to the user agreement and instructed that "[b]y opening and using a PayPal

8   account, you agree to comply with all of the terms and conditions of this agreement."[17]  PayPal

9   reserves the right to amend the user agreement and instructs merchants that, "[b]y continuing to use

10  our services after any changes to this user agreement or any of the other applicable terms,

11  agreements, or policies, you agree to be bound by those changes."[18]

12       34.      PayPal's Anti-Steering Rules, as set forth in its U.S. user agreement, provide:

13           **No surcharges**

14           You agree that you will not impose a surcharge or any other fee for
             accepting PayPal as a payment method. You may charge a handling fee in
15           connection with the sale of goods or services as long as the handling
             fee does not operate as a surcharge ***and is not higher than the handling***
16           ***fee you charge for non-PayPal transactions***.

17       35.      This prohibition on "surcharges" bars PayPal's co-conspiring merchants from offering

18  discounts or other pricing incentives to persuade consumers to complete eCommerce transactions

19  with payment options that compete with PayPal.  If a merchant lists a price of $50 for a product

20  purchased with PayPal, that merchant can charge no less when the consumer uses an alternative

21  means of payment.  The merchant could not, for example, reduce the list price of products purchased

22  with other payment methods, or provide a rebate at checkout when non-PayPal means of payment are

23  selected.  Any such discount would be treated as a "surcharge" on PayPal transactions and forbidden

24  as such under the Anti-Steering Rules.

25

26       ---
         [16] *See* PayPal User Agreement (U.S.), https://www.paypal.com/us/legalhub/useragreement-full
27  (last updated May 17, 2023).
         [17] *Id.*
28       [18] *Id.*

36.     PayPal's Anti-Steering Rules also prevent other non-price methods of steering consumers to payment methods other than PayPal.  Specifically, the rules provide:

**Presentation of PayPal and Venmo**

You must treat PayPal and/or Venmo payment methods or marks at least on par with any other payment methods or marks offered or displayed at your points of sale where PayPal or Venmo branded services are integrated, including your websites or mobile applications. This includes at least equal or better: logo placement, position within any point of sale, and treatment in terms of payment flow, terms, conditions, restrictions, and fees, in each case as compared to other marks and payment methods at your points of sale. Further, you must not present any payment method or mark upstream (or at an earlier point in the checkout experience) from the presentment of any of PayPal or Venmo services or marks.

In representations to your customers or in public communications, you must not mischaracterize any PayPal or Venmo services *or exhibit a preference for other payment methods over PayPal or Venmo services. Within all of your points of sale, you agree not to try to dissuade or inhibit your customers from using PayPal or Venmo services or encourage the customer to use an alternate payment method. If you enable your customers to pay you with PayPal or Venmo, whenever you display or exhibit the payment methods that you accept (either within any point of sale or in your marketing materials, advertising, and other customer communications) you agree to display the PayPal or Venmo services payment marks at least as prominently, and in at least as positive a manner, as you do for all other payment methods*.[19]

37.     These provisions prevent merchants from suggesting in any way that non-PayPal payment methods be used to complete eCommerce transactions.  A merchant could not, for example, communicate to its customers that alternatives to PayPal are more cost-effective and thus preferred.  Merchants cannot share this information directly with their customers, either on their websites or through email outreach.  Merchants also cannot express a preference for PayPal alternatives in any "public communications."  Nor can merchants engage in more subtle forms of steering, such as presenting other payment options "at an earlier point in the checkout experience" or as default options.  All of these competitive steering practices are prohibited by the Anti-Steering Rules.

---

[19] *Id.* (emphasis added).

**C.      PayPal's Anti-Steering Rules Have Several Anticompetitive Effects.**

38.      PayPal's Anti-Steering Rules forbid normal price competition that would otherwise benefit consumers.  In the absence of the Anti-Steering Rules, Plaintiffs and members of the proposed Class would have paid lower retail prices in eCommerce, output and innovation would be enhanced, and consumers would be able to make more informed market choices among payments solutions.

**1.      PayPal's Anti-Steering Rules Prevent eCommerce Merchants from Competing with Price Discounts That Would Benefit Consumers.**

39.      In the absence of PayPal's Anti-Steering Rules, eCommerce merchants could offer competitive discounts to consumers that elect to complete their transaction with payment methods other than PayPal.  And they would have ample reason to do so given the industry high fees PayPal charges merchants to complete transactions over its gateway.

40.      Currently, PayPal's headline rate for eCommerce transactions completed on the PayPal gateway is 3.49% plus a fixed fee of $0.49.[20] This means that when a consumer uses PayPal's digital wallet to make a $100 eCommerce purchase, the merchant must pay PayPal $3.98 (3.49% + $0.49).  PayPal generated total revenues in 2022 exceeding $27 billion, most of it coming from these gateway fees.[21]

41.      Merchants pay lower fees when consumers route their transactions over alternative payments gateways.  For example, eCommerce merchants can use gateways like Stripe and Shopify to accept various forms of online payment (including Apple Pay, Google Pay, and credit cards).  These gateways charge merchant fees that generally exceed 2.0% per transaction, plus certain fixed or monthly fees.[22]  While these gateway fees are substantial, they are significantly lower than PayPal's.

---

[20] *See* https://www.paypal.com/us/webapps/mpp/merchant-fees.

[21] PayPal Holdings, Inc., 2022 Form 10-K at 35 (Feb. 9, 2023), available at https://www.sec.gov/Archives/edgar/data/1633917/000163391723000033/pypl-20221231.htm.

[22] *See* https://stripe.com/pricing (last visited Oct. 4, 2023); https://www.shopify.com/pricing (last visited Oct. 4, 2023).

42.     Without PayPal's Anti-Steering Rules, merchants could naturally combat PayPal's high gateway fees simply by isolating their effect on prices to encourage consumers to select more cost-effective options at checkout.   For example, in a world where steering is permitted, merchants could and would steer consumers away from PayPal and its high fees by providing discounts when consumers use other means of online payment.  Discounts could take the form of lower list prices when non-PayPal payments are used, or similar discounts at checkout.  In either scenario, the consumer would end up paying less in eCommerce when using payment methods other than PayPal.

43.     In a competitive market, merchants would be incentivized to use discounts as a means of drawing customers to their online storefronts.  Price, after all, is a primary vector on which eCommerce merchants compete, and discounts are a fundamental pricing tool eCommerce merchants can use to attract business.

44.     Through the Anti-Steering Rules, PayPal and its co-conspiring merchants have eliminated this natural form of price competition and replaced it with a price floor below which the merchants have agreed they will not discount prices.  Regardless of the payment method the consumer selects, and regardless of the cost advantages it may have over PayPal, the co-conspiring merchants have agreed not to compete with discounts below they price they charge whenever PayPal is selected.

45.     Consumers like Plaintiffs and the Class they seek to represent were injured because, when paying with alternatives to PayPal, they were deprived of discounts they could have secured but-for the Anti-Steering Rules.

**2.     PayPal's Anti-Steering Rules Inflate Gateway Fees and the Consumer Prices in Which They are Reflected.**

46.     Even without discounts for non-PayPal transactions, Plaintiffs and the Class would have paid lower prices but for PayPal's Anti-Steering Rules.  This is because the rules inflate gateway fees across the industry, and these fees are baked into the prices consumers pay when they purchase goods in eCommerce.

47.     These market-wide effects arise from the manner in which the Anti-Steering Rules warp the incentives of both PayPal and competing payment gateways.  For PayPal, the Anti-Steering

Rules ensure that increases in PayPal's gateway fees (relative to a competitive baseline) will be subsidized by other payment platforms. For example, without the Anti-Steering Rules, if PayPal raised its gateway fees by $0.50 per transaction, merchants could fold that $0.50 into prices only for transactions when PayPal is the chosen method of payment. With $0.50 higher prices for PayPal-processed transactions, consumer demand for PayPal—and PayPal only—would shift accordingly to lower-priced payment methods. In other words, PayPal would shoulder the full repercussions of increasing its prices. Given the option to pay less when using payment options other than PayPal, many consumers would do so, driving transaction volume away from PayPal toward rival platforms.

48.     But under the Anti-Steering Rules, eCommerce merchants are not permitted to bake PayPal's fees into PayPal transactions only. Their only option is to increase prices *across the board*, regardless of the payment method selected by the consumer. So, in the foregoing example, rather than pricing PayPal-processed transactions $0.50 higher than other platforms, merchants must distribute that $0.50 cost increase across *all* eCommerce prices irrespective of the payment method used. The result is higher prices for *all* consumers, not just those using PayPal.

49.     In this fashion, the Anti-Steering Rules give PayPal assurance that, if it raises its gateway fees above the competitive baseline, part of the increase will be paid not by PayPal customers, but by customers of rival gateways. This ability to displace the effect of price increases on to customers of rival platforms generates perverse incentives for PayPal to increase its merchant fees above the fees it would charge in a world without the Anti-Steering Rules.

50.     For rival payment gateways, PayPal's Anti-Steering Rules suppress the normal incentives to compete on price. That is, steering customers away from high-cost options rewards firms that compete aggressively on price. In an environment where steering is permitted, gateways could "win" transactions by reducing their gateway fees below competitors' fees, thereby encouraging merchants to steer transactions toward their platforms. In response, other gateways would likewise be incentivized to reduce their gateway fees to discourage steering toward other platforms and/or prompt steering to their own. Likewise, the possibility of steering also incentivizes new entrants to find more efficient cost structures and enter the market at a better price. Steering, in

1   short, would put downward pressure not only on PayPal's gateway fees, but on gateway fees across

2   this industry.  This is how price competition normally works.

3         51.     The Anti-Steering Rules substantially diminish these incentives.  Unable to steer

4   consumers away from PayPal, rival gateways stand to gain little by undercutting PayPal on price.

5   Instead, they are incentivized to charge gateway fees that approach the supracompetitive levels

6   imposed by PayPal.

7         52.     In sum, the Anti-Steering Rules give PayPal perverse incentives to increase its

8   gateway fees above a competitive level and diminish other gateways' incentives to charge

9   substantially less.  This drives gateway fees up across the industry.

10        53.     In addition, PayPal's Anti-Steering Rules also preclude merchants from making other

11  payment options more salient to their customers at the point of purchase.  Absent this restriction,

12  merchants could set a lower-priced payment system as a default while still offering PayPal as an

13  alternative.  Because many eCommerce customers place a high premium on convenience, setting

14  defaults can be a powerful mechanism for encouraging customers towards one option while still

15  offering them a full range of choices for those with other preferences.  As PayPal's restrictions

16  implicitly acknowledge, even simply having one option displayed more prominently than another

17  can result in significant changes in consumer choice.[23]  Had they not been prevented from

18  encouraging customers to use a lower-priced payment gateway, merchants could have used these

19  techniques to reduce their gateway fees.

20        54.     PayPal's co-conspiring merchants have accepted PayPal's Anti-Steering Rules

21  knowing that they will not ultimately bear these inflated gateway fees.  These costs are shouldered

22  by eCommerce consumers like Plaintiff because, as industry analysts have long recognized, gateway

23  fees are built into the prices merchants charge consumers for goods purchased in eCommerce.

24  PayPal itself has informed regulators that "[p]rocessing payments is, like paying rent and hiring staff,

25

26

27

28
       [23] *See* Daniel G. Goldstein, et al., *Nudge Your Customers Toward Better Choices*, HARV. BUS.
       REV. (Dec. 2008), https://hbr.org/2008/12/nudge-your-customers-toward-better-choices.

a part of the cost of doing business, and should be absorbed into the final price of goods and services."[24]

55.     Merchants have also acknowledged as much.  Representing nearly 2,000 companies and 270 trade associations, the Merchants Payments Coalition recently advised Congress that payment processing fees are "most merchants' highest operating cost after labor—far too much to simply absorb—and drive-up consumer prices by more than $1,000 a year for the average family."[25] The Merchants Payment Coalition and its members further report that payment processing fees "account for between $2 and $4 of every $100 consumers spend.  In other words, a product that sells for $100 could sell for between $96 and $98 without these fees."[26]  In an extended study of the payments industry, the Reserve Bank of Australia similarly observed that "[t]he prices that merchants charge for goods and services incorporate the general costs of running a business, such as electricity and rent, as well as the cost of payments."[27]  The U.S. Department of Justice agrees, observing that inflated payment processing fees result in "higher retail prices."[28]

56.     These observations from regulators and the payments industry comport with basic economic theory.  Gateway fees are a variable costs eCommerce merchant bear, indeed one of their most substantial. Firms must recover their variable costs to remain profitable.  Accordingly, when variable costs increase to a supracompetitive level—as is the case with gateway fees—economic theory predicts that prices will increase to supracompetitive levels to compensate.

---

[24] PayPal Submission to Reserve Bank of Australia, *supra* note 2.

[25] *See* Merchants Payments Coalition, Letter dated June 7, 2023, available at https://merchantspaymentscoalition.com/wp-content/uploads/2023/06/MPC-Trade-Association-Letter-June-2023.pdf.

[26] *See* https://merchantspaymentscoalition.com/about-us/ (last visited Oct. 4, 2023) (FAQ "How do these fees impact consumers?").

[27] *See* Reserve Bank of Australia, *Payment Surcharges: Economics, Regulation and Enforcement* (Dec. 2018), available at https://www.rba.gov.au/publications/bulletin/2018/dec/payment-surcharges-economics-regulation-and-enforcement.html.

[28] *See* U.S. Justice Department, *supra* note 1.

### 3. PayPal's Anti-Steering Rules Prevent Consumers from Making Informed Choice Among Payment Alternatives.

57.     The Anti-Steering Rules also prevent merchants from informing consumers of the economic consequences of their choice in payments gateways.  In a competitive market, merchants could steer consumer behavior not only by offering discounts, but also by providing full information as to costs associated with various payments platforms, and the connection between those costs and retail prices.  This would allow consumers to make an informed choice among the options available to them.  If consumers were alerted to PayPal's industry-high gateway fees and encouraged to select other payment modes as a means of keeping prices down, many consumers would select alternatives to PayPal.  At a minimum, consumers would have the knowledge needed to make free and informed decisions.

58.     The Anti-Steering Rules sever this line of communication between merchants and their customers.  Barred from exhibiting any "preference for other payment methods," both at checkout and in any "public communications," merchants cannot alert consumers to the costs of accepting PayPal Payments and the effects of these costs on the prices consumers pay.  By design, this blinds consumers to the economic consequence of selecting PayPal at checkout.  This breakdown in the information exchange between merchants and their customers harms competition and consumers.  It allows PayPal to increase prices without facing the resistance an informed consumer base would pose.

### 4. PayPal's Anti-Steering Rules Reduce Output and Innovation.

59.     Basic laws of economics dictate that output—measured here as the number of eCommerce transactions—would be higher in the absence of PayPal's Anti-Steering Rules.

60.     Demand for products tends to decrease as prices increase.  This basic economic precept is manifest across industries, including eCommerce.  By elevating the price of eCommerce goods above the competitive level, PayPal's Anti-Steering Rules decrease demand commensurately. With diminished demand, there are fewer eCommerce transactions—that is, less output—than there would be in a market that developed without PayPal's Anti-Steering Rules.

61.     The Anti-Steering Rules also suppress innovation among payments gateways that would enhance consumer experience and improve quality.  Without the Anti-Steering Rules, payments gateways would be incentivized to improve the security and functionality of their platforms to encourage merchants to steer transactions toward their brand.  But operating under the Anti-Steering Rules, merchants cannot tell their customers that alternatives to PayPal are better functioning or more secure.  This discourages innovation that would improve eCommerce.

**D.     There are No Procompetitive Justifications for the Anti-Steering Rules.**

62.     The Anti-Steering Rules do not serve any plausible procompetitive purpose.  The rules function only to insulate PayPal from competition from other payment gateways.

63.      The higher consumer prices resulting from the Anti-Seering Rules are also not offset by any countervailing benefits to consumers.  There is no evidence that PayPal has used its supracompetitive gateway fee revenue to fund consumer benefits, much less benefits that outweigh the harm.  For consumers, PayPal's digital wallets are functionally identical to wallets offered by other providers.

64.     While increasing consumer prices, PayPal's Anti-Steering Rules also offer no justifying *pro*competitive benefits on the merchant side of the market. As a result of the Anti-Steering Rules, the gateway fees merchants pay PayPal and other payments gateways are higher, not lower.  The Anti-Steering Rules also prevent merchants from engaging in competitive forms of price discrimination to attract consumers, including offering consumers discounts for cost-effective payment gateways. The Anti-Steering Rules further diminish merchants' ability to compete by preventing merchants from communicating with their customers to promote cost-effective alternatives to PayPal.

65.     In sum, both the consumer and merchant sides of the market, and the market overall, is less competitive because of the Anti-Steering Rules.  The rules have anticompetitive effect considering the market as a whole.

# VI.   RELEVANT MARKET AND MARKET POWER

## A.   The eCommerce Market

66.   PayPal's Anti-Steering Rules operate on retail prices charged within eCommerce, the relevant antitrust product market for assessing harm to the Plaintiffs and the proposed Class.

67.   Regulators, economists, customers and retailers alike recognize the retail eCommerce market as a distinct market within the U.S. retail market. For example, the U.S. Census Bureau defines eCommerce as "[t]he sale of goods and services where the buyer places an order, or the price and terms of the sale are negotiated over an Electronic Data Interchange, the Internet, or any other online system (extranet, e-mail, instant messaging)."[29] The market also includes mobile shopping.[30] It has collected data on eCommerce sales since 1998[31] and it publishes quarterly eCommerce reports.[32] More recently, the Census Bureau released a supplemental data table on retail eCommerce by type of retailer to enhance "understanding of where consumers are shopping online" and "provide an overview of trends in retail and e-commerce sales."[33] Census data are also available for eCommerce sales by type of product.[34] Similarly, the Bureau of Labor Statistics Producer Price Index (PPI) program separately tracks the eCommerce industry group, which includes both electronic shopping and auctions.[35] According to a publication by the U.S. Bureau of Labor Statistics, eCommerce retailers typically maintain lower margins than brick-and-mortar stores because of lower overhead costs associated with preserving store appearance, *e.g.*, décor and store

---

[29] U.S. Census Burau, *Monthly Retail Trade: Definitions*, https://www.census.gov/retail/definitions.html (last visited Oct. 5, 2023).

[30] Statista Research Dep't, *E-commerce in the United States - Statistics & Facts*, STATISTA (Aug. 31, 2023), https://www.statista.com/topics/2443/us-ecommerce/.

[31] U.S. Dep't of Commerce, *New Insights on Retail E-Commerce* (July 26, 2017), https://www.commerce.gov/data-and-reports/reports/2017/07/new-insights-retail-e-commerce.

[32] https://www.census.gov/retail/ecommerce/historic_releases.html (last visited Oct. 4, 2023).

[33] U.S. Dep't of Commerce, *supra* note 31.

[34] *Id.*

[35] Lana Borgie, *Trends in producer prices between e-commerce and brick-and-mortar retail trade establishments*, 3 BEYOND THE NUMBERS 1-10 (Aug. 2014), https://www.bls.gov/opub/btn/volume-3/pdf/trends-in-producer-prices-between-e-commerce-and-brick-and-mortar-retail-trade-establishments.pdf.

maintenance.[36] Because they do not have the same overhead, the publication finds that online retailers can provide more competitive prices, whereas brick-and-mortar stores, on the other hand, offer consumers immediate gratification and personalized service.[37]

68.     ECommerce has unique characteristics, including in the way products are marketed and distributed. Economists recognize that the "[i]nternet represents a fundamentally different environment for retailing from traditional retailing."[38] An online channel has distinct characteristics from a physical channel.[39] Ecommerce has a superior method of transmitting information, effective asynchronous communication, greater flexibility in dealing with information, with far greater interactivity and search capability.[40] "Despite the relative inefficiency of delivering goods directly to the home," eCommerce leads to unique cost savings because "supplying direct to the consumer is less expensive than doing so through a store."[41] ECommerce retail businesses avoid the costs "of handling within the store (unpacking, stocking and maintaining shelves, and such), theft (which can easily account for 3 percent of the sales of a retailer), rent (low-cost distribution centers replace expensive urban or suburban real estate), and selling costs (automated and tele-sales replace relatively expensive in-store salespeople)."[42] Consumers similarly benefit from greater "information about available goods and services, and services; an improvement in access to these goods; and the ability to customize goods to fit the tastes of buyers."[43] Economists also recognize that the physical

[36] *Id.* at 3.

[37] *Id.* at 2-3.

[38] Sandra M. Forsythe & Bo Shi, *Consumer patronage and risk perceptions in Internet shopping* at 874, 56 J. OF BUS. RESEARCH 867–875 (2003), http://www.drronmartinez.com/uploads/4/4/8/2/44820161/consumer_patronage_and_risk_perceptions.pdf.

[39] Chayapa Katawetawaraks & Cheng Lu Wang, *Online Shopper Behavior: Influences of Online Shopping Decision*, 1 ASIAN J. OF BUS. RESEARCH 66-74 (2011), https://www.magscholar.com/joomla/images/docs/ajbr/ajbrv1n2/ajbr110012.pdf.

[40] Severin Borenstein and Garth Saloner, *Economics and Electronic Commerce* at 5, 15 J. OF ECON. PERSPECTIVES 3-12 (2001), https://www.gsb.stanford.edu/sites/gsb/files/publication-pdf/Economics%20and%20Electronic%20Commerce.pdf; *see also* David VanHoose, ECOMMERCE ECONOMICS (Routledge 2nd ed. 2011), http://cw.routledge.com/textbooks/vanhoose/.

[41] Borenstein & Saloner, *supra* note 40, at 5.

[42] *Id.* at 5-6.

[43] *Id.* at 6-7.

location of the business operating within eCommerce becomes less relevant because the eCommerce market "facilitates production and distribution across borders . . . and can assist in opening markets that were previously closed."[44] The lower transaction costs and production costs also facilitate easier entry into the market and increase competition.[45] Demand side preferences also make online retailing unique in terms of certain factors such as convenience and price.[46] Because competing offers are "just a few clicks away on the Internet, online consumers can more easily compare different alternatives before buying with lower search cost than offline consumers."[47] Online shoppers can also more easily put off purchases decisions until they are ready to buy because they have not invested in travel time and do not face the pressure from the salespeople that shoppers in brick-and-mortar stores experience.[48]

69.     U.S. retailers recognize the online market as a separate economic entity. Established large retailers, *e.g.*, Walmart, Target, and Costco, have an online presence, but focus their efforts overwhelmingly on their physical stores. For example, in 2017, eCommerce accounted for only 5.5%

---

[44] Andrew D. Mitchel, *Towards Compatibility: The Future of Electronic Commerce within the Global Trading System* at 686-87, 4 J. INT'L ECON. LAW 683-723 (2001), https://www.researchgate.net/profile/Andrew-Mitchell-22/publication/31144725_Towards_Compatibility_The_Future_of_Electronic_Commerce_Within_the_Global_Trading_System/links/540db8ec0cf2df04e7565215/Towards-Compatibility-The-Future-of-Electronic-Commerce-Within-the-Global-Trading-System.pdf.

[45] *Id.*

[46] Tracey Wallace, The 2018 Omni-Channel Retail Report: Generational Consumer Shopping Behavior Comes Into Focus, https://www.bigcommerce.co.uk/blog/omni-channel-retail/#developing-your-omni-channel-strategy; *see also* Isabel P. Enrique and Sergio Romàn, *The Influence of Consumers' Cognitive and Psychographic Traits on Perceived Deception: A Comparison Between Online and Offline Retailing Contexts*, 119 J. BUS. ETHICS 405-422 (2014) (examining the role of several consumers' cognitive and psychographic traits in their perception of retailers' deceptive practices (perceived deception) and the different effects on perceived deception associated with online vis- à-vis in-store shopping, indicating that they need to be considered as distinct experiences for the customer).

[47] Enrique & Romàn, *supra* note 46, at 408.

[48] *Id.*

of revenue for Target,[49] 4% for Costco,[50] and 3% for Walmart.[51] Only 28% of small businesses sell online.[52] Online retailers commonly advertise only online, whereas store retailers advertise both on and offline.[53] Unlike brick-and-mortar stores, eCommerce retailers do not have a way to take payment by cash or checks.[54] Brick-and-mortar stores typically provide customer service in-store to respond to questions about product offerings, whereas customer service for eCommerce retail is typically less comprehensive or effective.[55]

70.     U.S. consumers distinguish between eCommerce and brick-and-mortar shopping markets. As a practical matter, the eCommerce market requires access, usually through a personal computer, smart phone, or tablet, and most, but not all U.S. consumers have access to this market.[56] According to a Pew Research Center study in 2016, 64% of U.S. consumers prefer shopping in physical stores, and when purchasing something for the first time, 84% of U.S. consumers found it important to be able to ask questions about what they are buying from sellers they are familiar with, and 78% think it is important to be able to try the product out in person, where physical stores have an advantage over eCommerce.[57]

---

[49] Nat Levy, *Target's digital sales grew 10X faster than in-store sales in 2018, as retailer adjusts to battle Amazon*, GEEKWIRE (Mar. 5, 2019), https://www.geekwire.com/2019/targets-digital-sales-grew-10x-faster-store-sales-2018-retailer-adjusts-battle-amazon/.

[50] Trefis Team, *How Much Of Wal-Mart's Revenue Will Come From E-Commerce In 2020?*, FORBES (Nov. 27, 2017), https://www.forbes.com/sites/greatspeculations/2017/11/27/how-much-of-wal-marts-revenue-will-come-from-e-commerce-in-2020/.

[51] Bloomberg News, *E-commerce accounts for 4% of Costco's sales and is growing 12%*, DIGITAL COMMERCE 360 (Mar. 6, 2017), https://www.digitalcommerce360.com/2017/03/06/e-commerce-accounts-4-costcos-sales-growing-12/.

[52] Jia Wertz, *How Brick-And-Mortar Stores Can Compete With E-Commerce Giants*, FORBES (May 17, 2018), https://www.forbes.com/sites/jiawertz/2018/05/17/how-brick-and-mortar-stores-can-compete-with-e-commerce-giants/.

[53] Anna Johansson, *6 Fundamental Differences Between E-Commerce & Brick-and-Mortar Stores*, RETAILNEXT (Mar. 27, 2018), https://retailnext.net/en/blog/6-fundamental-differences-between-e-commerce-and-brick-and-mortar-stores/.

[54] *Id.*

[55] *Id.*

[56] Aaron Smith & Monica Anderson, *Online Shopping and E-Commerce*, PEW RESEARCH CENTER (Dec. 19, 2016), https://www.pewresearch.org/internet/2016/12/19/online-shopping-and-e-commerce/.

[57] *Id.*

71.     ECommerce attracts a younger demographic. A 2017 survey by Statista found that 67% of Millennial shoppers preferred to search and purchase on eCommerce sites rather than in store, while only 28% of seniors do.[58] Online retailers offer a broader selection and a larger inventory than offline retailers do. Consumers can shop online 24/7 and locate hard-to-find items more easily than they could by searching physical stores.[59] Online retail provides greater convenience to consumers who can order products from any location without having to find a brick-and-mortar store selling the specific product with the specific desired attributes and the desired quantity.[60] Shopping in physical stores offers more social interaction and socializing with other shoppers and it is faster and easier to return a defective or unwanted product in-store rather than shipping back to an online retailer.[61]

72.     ECommerce stores also have a distinctly different look and feel to customers than markets that rely on a different chain of distribution, *e.g.*, in-store purchases, mail-order or purchases made from traveling sales staff. Typically, with a few clicks or a simple voice command, an eCommerce retailer will send the product directly to the consumers without any interaction with sales staff.

**B.      The Relevant Geographic Market is the United States.**

73.     The United States is a relevant geographic market for purposes of assessing PayPal's Anti-Steering Rules.  PayPal imposes U.S.-specific terms and conditions on the merchants utilizing its payments platform, and the Anti-Steering Rules are set forth in those U.S. terms and conditions. Providers of eCommerce Payment Solutions also frequently maintain U.S. specific fees.  PayPal itself publishes fees for the "Relevant Market/Region" of the United States.[62]

---

[58] Stephanie Chevalier, *U.S. online shopping preference 2017, by age group*, STATISTA (Oct. 13, 2021), https://www.statista.com/statistics/242512/online-retail-visitors-in-the-us-by-age-group/.

[59] Susan Ward, *Brick and Mortar Stores vs Online Retail Sites*, THE BALANCE (updated Sept. 12, 2022), https://www.thebalancesmb.com/compare-brick-and-mortar-stores-vs-online-retail-sites-4571050; https://www.commerce.gov/news/fact-sheets/2017/07/new-insights-retail-e-commerce.

[60] *Id.*

[61] Ward, *supra* note 59.

[62] *See* PayPal Merchant Fees, available at: https://www.paypal.com/us/webapps/mpp/merchant-fees.

1    **C.    Market Power**

2          74.    Market power is defined as ability to increase prices above the competitive level.  As

3    alleged in this complaint, PayPal's co-conspiring merchants have charged Plaintiffs and the proposed

4    Class supracompetitive prices for goods purchased in eCommerce.  These supracompetitive prices

5    have been imposed over a sustained period and show no signs of abating.

6          75.    PayPal's co-conspirators also command a market share that is more than sufficient to

7    exercise market power.  More than 82.8% of the top 1,000 online merchants accept PayPal as a

8    means of payment.[63]  This collective share of the eCommerce market approximates the reach of

9    PayPal's Anti-Steering Rules because every eCommerce merchant that accepts PayPal agrees to

10   these restraints.  The consumer injury in the eCommerce Market is caused by the collective use and

11   imposition of the Anti-Steering Rules by all of PayPal's co-conspiring merchants.

12         76.    New entry into the eCommerce market also does not pose significant competitive

13   constraints on PayPal or its co-conspirators because new online merchants generally accept PayPal

14   given PayPal's dominance as a payments platform.  That is, new entrants in the eCommerce market

15   generally become co-conspirators, agreeing to PayPal's Anti-Steering Rules, rather than competitive

16   alternatives to which consumers can turn to fulfill their eCommerce needs.

17                        **VII.    ANTITRUST INJURY**

18         77.    Plaintiffs and members of the proposed Class purchased products directly from co-

19   conspiring PayPal merchants that accept PayPal and have agreed to PayPal's Anti-Steering Rules.

20   Because of PayPal's Anti-Steering Rules, Plaintiffs and members of the proposed Class paid more

21   for products than they would have otherwise.  The Anti-Steering Rules prevented merchants from

22   offering Plaintiffs and members of the proposed Class discounts for using means of payment that are

23   more cost-effective than PayPal.  The Anti-Steering Rules also limited competition on merchant fees

24   that are incorporated into the prices co-conspiring merchants charged Plaintiffs and the proposed

25   Class.  PayPal has therefore caused Plaintiffs and the proposed Class to suffer overcharge damages.

26   And because PayPal and its co-conspiring merchants continue to impose PayPal's Anti-Steering

27

28   ———————————
     [63] Salois, *supra* note 15.

Rules, Plaintiffs and the proposed Class are reasonably likely to incur future overcharges.  The full amount of such overcharge damages will be calculated after discovery and upon proof at trial.

78.     By preventing merchants from steering consumers to other payment methods, including by communicating the comparative costs of PayPal, the Anti-Steering Rules prevent Plaintiffs and consumers from making informed choice between alternative payments platforms. This is an antitrust injury over and above the overcharge damages incurred by Plaintiffs and the proposed Class.

79.     The restraints challenged by Plaintiffs operated directly on the prices they paid in eCommerce, and there are no more direct victims to challenge the legality of these restraints.   The injuries suffered by Plaintiffs and the Proposed Class are the direct and foreseeable result of PayPal's anticompetitive conduct, as alleged herein.  These injuries—overcharges and inhibited choice among market alternatives—are nonspeculative, concrete, and the type of injuries the antitrust laws are intended prevent.

## VIII.   INTERSTATE TRADE AND COMMERCE

80.     The conduct of PayPal as alleged in this complaint was within the flow of, and substantially affected, interstate commerce.  PayPal provides payment solutions across the country and with respect to transactions that cross state boundaries.  The Anti-Steering Rules at issue in this complaint likewise operate across, and without regard to, state lines.

## IX.     CLASS ALLEGATIONS

81.     PayPal's user agreement, which purports to govern consumers' "use of [their] PayPal account[s]," contains an arbitration clause providing for the arbitration of certain claims between PayPal and its users.[64]  Without expressing any view on the enforceability of these arbitration provisions, Plaintiffs bring this action on behalf of consumers who made online purchases without using a PayPal account or using PayPal services.  These consumers were overcharged because PayPal's Anti-Steering Rules prevent merchants from offering discounts when consumers use payment methods other than PayPal, and otherwise inflate eCommerce prices across the board,

---

[64] *See* PayPal User Agreement, *supra* note 16.

1   regardless of payment method.  Even if PayPal's arbitration clause were deemed enforceable, it

2   would not apply to the claims asserted in this action.

3       82.     Specifically, Plaintiffs, on behalf of themselves and as a class action under the Federal

4   Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seek damages and injunctive relief on behalf

5   of the members of the following Class:

6           **Nationwide Class:** All persons who, during the Class Period, used a
            payment method other than PayPal to make a purchase in the United
7           States from a United States eCommerce merchant that accepted PayPal
            as one means of payment.
8
            **California Subclass**: All persons who, during the Class Period, used a
9           payment method other than PayPal to make a purchase in California
            from a United States eCommerce merchant that accepted PayPal as one
10          means of payment.

11      83.     For purposes of the foregoing Class and Subclass definitions, the "Class Period"

12  means on or after October 5, 2019.

13      84.     For purposes of the foregoing Class and Subclass definitions, a "United States

14  eCommerce merchant" is a merchant that agreed to PayPal's U.S. "User Agreement."[65]

15      85.     Excluded from the Class are the Defendants and their officers, directors, management,

16  employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to

17  whom this case is assigned, as well as those judges' immediate family members, judicial officers and

18  their personnel, and all governmental entities.

19      86.     **Numerosity:** Members of the Class are so numerous that joinder is impracticable.

20  Plaintiffs believe that there are tens of millions of members of the Class (if not more), geographically

21  dispersed throughout the United States, such that joinder of all Class members is impracticable.

22  Plaintiffs believe that there are millions of members of the Subclass, such that joinder of all Subclass

23  members is likewise impracticable.

24      87.     **Typicality:** Plaintiffs' claims are typical of the claims of the other Class members.

25  The factual and legal bases of Defendants' liability are the same and resulted in injury to Plaintiffs

26  and all other members of the proposed Class.

27

28      ───────────────────
        [65] *See* PayPal User Agreement, *supra* note 16.

CLASS ACTION COMPLAINT - 25
Case No.: 5:23-cv-5100
011184-11/2352971 V2

88.     **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed Class both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Class, and their interests do not conflict with the interests of the proposed Class members they seek to represent.

89.     **Commonality:** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the Class and because Class members share a common injury. Thus, determining damages with respect to the Class as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiffs and the proposed Class are inherent in Defendants' wrongful conduct because the overcharge injuries incurred by Plaintiffs and each member of the proposed Class arose from the same anticompetitive conduct alleged herein.

90.     There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

a.      Whether Defendants and online merchants unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing, pursuant to PayPal's Anti-Steering Rules, that the merchants would not charge prices on non-PayPal transactions that are less than the prices they charge when PayPal is used as the method of Payment;

b.      Whether Defendants and online merchants unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing, pursuant to PayPal's Anti-Steering Rule, that the merchants would not otherwise incentivize or encourage consumers to use payment methods other than PayPal;

c.      Whether Defendants and online merchants, through the actions alleged in this complaint, violated competition and consumer protection laws in the state of California;

d.      Whether competition in a relevant market has been restrained and harmed by Defendants' conduct;

e.      Whether consumers and Class members have been damaged by Defendants' conduct;

f. The amount of any damages; and

g. The nature and scope of injunctive relief necessary to restore a competitive market.

91. **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for Defendants. Certification of Plaintiffs' proposed Class would prevent these undesirable outcomes.

92. **Injunctive relief:** By way of its conduct described in this complaint, Defendants have acted on grounds that apply generally to the proposed Class. Accordingly, final injunctive relief is appropriate respecting the Class as a whole.

93. **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed Class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## X. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1|
### (ON BEHALF OF NATIONWIDE CLASS)

94. Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

95. Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

96. In violation of Section 1 of the Sherman Act, PayPal entered into agreements with eCommerce merchants concerning the price these merchants were allowed to sell products in the United States. Specially, PayPal and the co-conspiring merchants agreed to certain Anti-Steering

1    Rules that prevent the merchants from offering discounts on products purchased in eCommerce with

2    means of payment other than PayPal.  The Anti-Steering Rules to which PayPal and its co-conspiring

3    merchants have agreed further prevent the merchants from otherwise encouraging customers to use

4    non-PayPal means of payment, including by expressing a preference for these methods or prioritizing

5    them on their online storefronts.

6           97.    These unlawful agreements have unreasonably restrained price competition among

7    the merchants, and among PayPal and other payment gateways, resulting in overcharges to Plaintiffs

8    and the Class, a reduction in output, and diminished consumer choice.

9           98.    To the extent Plaintiffs are required to define a relevant antitrust market, this

10   complaint does so.  The Anti-Steering Rules operate on prices co-conspiring markets charge in

11   eCommerce, a relevant antitrust market that is distinct from brick-and-mortar retail and other forms

12   of retail.

13          99.    The relevant geographic market is the United States.

14          100.   There are no legitimate procompetitive justifications for the Anti-Steering Rules.  Any

15   asserted justifications are outweighed by the Anti-Steering Rules' anticompetitive effects and could

16   be achieved through less restrictive means.

17                              **SECOND CAUSE OF ACTION**

18                   **VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,**
                     **CAL. BUS. & PROF. CODE § 16700, ET SEQ.**
19                   **(ON BEHALF OF THE CALIFORNIA SUBCLASS)**

20          101.   Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

21          102.   Plaintiff Christian Sabol brings this Cartwright Act claim on his own behalf and on

22   behalf of each member of the proposed California Subclass, as described above.

23          103.   The California Business & Professions Code generally governs conduct of corporate

24   entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in

25   California.

26          104.   California policy is that "vigorous representation and protection of consumer interests

27   are essential to the fair and efficient functioning of a free enterprise market economy," including by

28   fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

105.    A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, increasing the price of merchandise, preventing competition in the market for a commodity, or agreeing not to sell a product below a common standard figure, or fixed value. Cal. Bus. & Prof. Code § 16720.

106.    PayPal's has entered a trust with its co-conspiring merchants in restraint of trade by agreeing to Anti-Steering Rules that restrict the price at which the co-conspiring merchants can sell products purchased with non-PayPal means of payment.

107.    Every trust to restrain trade in California is *per se* unlawful except as provided by the Code. *Id.* at § 16726. No exceptions apply to the Anti-Steering Rules.

108.    Members of the California Subclass made purchases during the Class Period from co-conspiring merchants that agreed to PayPal's Anti-Steering rules.  But for this Anti-Steering Rules, the prices paid by California Subclass members would have been lower, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,<br>CAL. BUS. & PROF. CODE § 17200, ET SEQ.<br>(ON BEHALF OF THE CALIFORNIA SUBCLASS)

109.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

110.    California's Unfair Competition Law (UCL) defines "unfair competition" to include any "unlawful, unfair, or fraudulent" business act or practice. Cal. Bus. & Prof. Code §§ 17200 *et seq*.  PayPal has engaged in acts and practices that are unlawful, unfair, and fraudulent.

111.    The Anti-Steering Rules, agreed between PayPal and its co-conspiring merchants, violate the Sherman Act and Cartright Act and thus are "unlawful" for purposes of the UCL.

112.    The Anti-Steering Rules also violate the "unfair" prong of the UCL because they constitute at least an incipient violation of the antitrust laws, violate the policy and spirit of the antitrust laws, threaten to harm competition, and are substantially injurious to consumers.

113.    The Anti-Steering Rules also operate in a deceptive and fraudulent manner in violation of the UCL.  By design, the Anti-Steering Rules deceive consumers by shielding them from the economic consequences of selecting PayPal as a means of payment over alternatives available to

1    them.  If merchants could steer consumers by conveying the true costs of accepting PayPal, including

2    the higher consumer prices resulting from PayPal's high gateway fees, many consumers would select

3    other means of payment.

4        114.    The illegal conduct alleged herein is continuing and there is no indication that PayPal

5    and its co-conspiring merchants will cease such activity in the future.

6        115.    PayPal's conduct in violation of the UCL has caused Plaintiffs and members of the

7    California Subclass to pay supra-competitive and artificially inflated prices for products in

8    eCommerce.   Plaintiffs and the members of the California Subclass suffered injury in fact and lost

9    money or property as a result of such unfair competition.

10       116.    As alleged in this complaint, PayPal and its co-conspirators have been unjustly

11   enriched in violation of the UCL. Plaintiffs and the members of the California Subclass are

12   accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues,

13   earnings, profits, compensation, and benefits that may have been obtained as a result of such

14   business practices, pursuant to California Business and Professions Code sections 17203 and 17204.

**JURY DEMAND**

16       Plaintiffs demand a trial by jury on all issues so triable.

1    DATED: October 5, 2023.                    Respectfully submitted,

2                                               **HAGENS BERMAN SOBOL SHAPIRO LLP**

3                                               By */s/ Ben Harrington*
4                                                   Ben M. Harrington (SBN 313877)
                                                    Abby R. Wolf (SBN 313049)
5                                               715 Hearst Avenue, Suite 202
                                                Berkeley, California 94710
6                                               Telephone: (510) 725-3000
                                                Facsimile: (510) 725-3001
7                                               benh@hbsslaw.com
8                                               abbyw@hbsslaw.com

9                                               Steve W.  Berman (*pro hac vice forthcoming*)
                                                Barbara A. Mahoney (*pro hac vice forthcoming*)
10                                              **HAGENS BERMAN SOBOL SHAPIRO LLP**
11                                              1301 Second Avenue, Suite 2000
                                                Seattle, WA  98101
12                                              Telephone:  (206) 623-7292
                                                Facsimile:  (206) 623-0594
13                                              steve@hbsslaw.com
                                                barbaram@hbsslaw.com
14

15                                              Brian D. Clark (*pro hac vice* forthcoming)
                                                Stephen J. Teti (*pro hac vice* forthcoming)
16                                              Arielle S. Wagner (*pro hac vice* forthcoming)
                                                Develyn J. Mistriotti (*pro hac vice* forthcoming)
17                                              **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
                                                100 Washington Avenue South, Suite 2200
18                                              Minneapolis, MN 55401
                                                Telephone: (612) 339-6900
19                                              Facsimile: (612) 339-0981
                                                bdclark@locklaw.com
20                                              sjteti@locklaw.com.com
                                                aswagner@locklaw.com
21                                              djmistriotti@locklaw.com

22                                              *Attorneys for Plaintiffs and the Proposed Class*

23

24

25

26

27

28

CLASS ACTION COMPLAINT - 31
Case No.: 5:23-cv-5100
011184-11/2352971 V2