Patrick T. Hein (SBN 254431)
ALLEN OVERY SHEARMAN STERLING US LLP
140 New Montgomery Street, 10th Floor
San Francisco, CA 94105-2997
Tel.: (415) 616-1100
patrick.hein@aoshearman.com

Adam S. Hakki (admitted *pro hac vice*)
Richard Schwed (admitted *pro hac vice*)
ALLEN OVERY SHEARMAN STERLING US LLP
599 Lexington Ave.
New York, NY 10022
Tel.: (212) 848-4000
adam.hakki@aoshearman.com
rschwed@aoshearman.com

*Counsel for Defendants PayPal Holdings, Inc.
and PayPal, Inc.*

[ADDITIONAL COUNSEL ON SIGNATURE PAGE]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| CHRISTIAN SABOL, SAMANTHIA RUSSELL, LAURA MCKINNEY, CHELCIE BLAKE, GREGORY NOHRENBERG, and STEPHEN PHILLIPS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PAYPAL HOLDINGS, INC., a California Corporation, PAYPAL, INC., a California Corporation,[1]<br><br>Defendants. | Case No.: 4:23-cv-05100-JSW<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS PAYPAL HOLDINGS, INC.'S AND PAYPAL, INC.'S MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Judge: Hon. Jeffrey S. White<br><br>Date:  February 28, 2025<br>Time:  9:00 AM |

---

[1] The complaint's caption erroneously asserts that PayPal Holdings, Inc. and PayPal, Inc. are "California Corporations."  They are incorporated under the laws of Delaware.

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ................................................................. 3

    I.    PayPal's Digital Payments Platform and Its User Agreement ............................. 3

    II.   The Original Complaint and the Court's Order Dismissing It ............................. 3

    III.  The Amended Complaint ................................................................................. 4

ARGUMENT ................................................................................................................. 4

    I.    The Amended Complaint Does Not Cure Plaintiffs' Lack of
        Antitrust Standing ........................................................................................ 4

        A.    Plaintiffs Have Not Established Standing Under *AGC* ........................... 5

        B.    Plaintiffs Lack Standing To Assert Their State Antitrust
             Law Claims ...................................................................................... 11

    II.   The Amended Complaint Does Not State an Antitrust Claim ........................... 13

        A.    The Proposed "eCommerce Market" Is Not an Antitrust
             Market ............................................................................................. 13

        B.    Plaintiffs Fail To Plausibly Allege That PayPal Has
             Market Power ................................................................................... 16

        C.    Plaintiffs Do Not Plausibly Allege the User Agreement Is
             Anticompetitive ................................................................................ 17

    III.  Plaintiffs Fail To Allege Distinct State Law Consumer Protection
        Claims ....................................................................................................... 20

CONCLUSION ............................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amazon.com, Inc. eBook Antitrust Litig.*,
2024 WL 918030 (S.D.N.Y. Mar. 2, 2024) ...............................................................17

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) .......................................................................................... *passim*

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
985 F. Supp. 2d 612 (S.D.N.Y. 2013) .....................................................................17

*Brantley v. NBC Universal, Inc.*,
2008 WL 11338585 (C.D. Cal. Mar. 10, 2008) ...............................................17, 19

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ...........................................................................................14, 15

*Carefirst of Md., Inc. v. Johnson & Johnson*,
2024 WL 3858249 (E.D. Va. Aug. 16, 2024) ..........................................................12

*In re Cattle & Beef Antitrust Litig.*,
687 F. Supp. 3d 828 (D. Minn. 2023) ......................................................................20

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021) ......................................................................................5

*Cole v. Champion Enters., Inc.*,
496 F. Supp. 2d 613 (M.D.N.C. 2007) .....................................................................13

*Coronavirus Rptr. v. Apple, Inc.*,
2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) .........................................................19

*Coronavirus Rptr. v. Apple, Inc.*,
85 F.4th 948 (9th Cir. 2023) ...............................................................................14, 20

*Cnty. of Toulumne v. Sonora Cmty. Hosp.*,
236 F.3d 1148 (9th Cir. 2001) ..................................................................................13

*Crouch v. Crompton Corp.*,
2004 WL 2414027 (N.C. Super. Ct. Oct. 28, 2004).................................................12

*In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*,
2015 WL 3988488 (N.D. Ill. June 29, 2015) ...........................................................12

*In re Data Gen. Corp. Antitrust Litig.*,
529 F Supp 801 (N.D. Cal. 1981) .............................................................................15

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  362 F. Supp. 3d 510 (N.D. Ill. 2019)..................................................................12

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002)............................................................................20

*Flaa v. Hollywood Foreign Press Ass'n*,
  55 F.4th 680 (9th Cir. 2022)............................................................................16

*Ford v. Cascade Health Servs.*,
  2004 WL 1445523 (D. Or. June 25, 2004).......................................................13

*Frame-Wilson v. Amazon.com, Inc.*,
  591 F. Supp. 3d 975 (W.D. Wash. 2022) .........................................................16

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020)............................................................................13

*Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.*,
  2010 WL 1541257 (N.D. Cal. Apr. 16, 2010) ..................................................14

*Gutzwiller v. Visa U.S.A., Inc.*,
  2004 WL 2114991 (Minn. D. Ct. Sept. 15, 2004) ............................................13

*In re Interior Molded Doors Antitrust Litig.*,
  2019 WL 4478734 (E.D. Va. Sept. 18, 2019) ..................................................12

*JES Props., Inc. v. USA Equestrian, Inc.*,
  2005 WL 1126665 (M.D. Fla. May 9, 2005).....................................................20

*Jones v. Micron Tech. Inc.*,
  400 F. Supp. 3d 897 (N.D. Cal. Sept. 3, 2019) ...........................................9, 10

*Kaplan v. Burroughs Corp.*,
  611 F.2d 286 (9th Cir. 1979)............................................................................15

*Kelsey K. v. NFL Enters. LLC*,
  2017 WL 3115169 (N.D. Cal. July 21, 2017), ...................................................5

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018)..............................................................................3

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
  884 F.2d 504 (9th Cir. 1989)............................................................................17

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. Mar. 23, 2012) ..............................................15

*Lorix v. Crompton Corp.*,
    736 N.W.2d 619 (Minn. 2007) ........................................................................................13

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*,
    2015 WL 4755335 (N.D. Cal. Aug. 11, 2015) ...................................................................9

*Mack v. Bristol-Myers Squibb Co.*,
    673 So.2d 100, 102 (Fla. Dist. Ct. App. 1996) ...............................................................11

*In re Magnesium Oxide Antitrust Litig.*,
    2011 WL 5008090 (D.N.J. Oct. 20, 2011) ......................................................................10

*McArthur Dairy, LLC v. McCowtree Bros. Dairy, Inc.*,
    2011 WL 2118701 (S.D. Fla. May 27, 2011) ..................................................................13

*In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Practices Litig.*,
    275 F. Supp. 3d 218 (D.D.C. 2017) ..................................................................................9

*MLW Media LLC v. World Wrestling Ent., Inc.*,
    655 F. Supp. 3d 946 (N.D. Cal. Feb. 13, 2023) ..............................................................15

*Monreal v. GMAC Mortg., LLC*,
    948 F. Supp.2d 1069 (S.D. Cal. 2013) ............................................................................20

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) ..............................................................................13, 15, 16, 20

*Oliver v. Am. Express Co.*,
    2020 WL 2079510 (E.D.N.Y. Apr. 30, 2020) .................................................................12

*Pac. Steel Grp. v. Com. Metals Co.*,
    600 F. Supp. 3d 1056 (N.D. Cal. 2022) ..........................................................................15

*Paddock Pubs., Inc. v. Chi. Tribune Co.*,
    1995 WL 632031 (N.D. Ill. Oct. 25, 1995) ...........................................................17, 19, 20

*Rebel Oil Co., Inc. v. Atl. Ritchfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ...........................................................................................16

*Reilly v. Apple Inc.*,
    578 F. Supp. 3d 1098 (N.D. Cal. 2022) .................................................................12, 15, 16

*Sherr v. HealthEast Care Sys.*,
    262 F. Supp. 3d 869 (D. Minn. 2017) .............................................................................13

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) .............................................................................................6

*Spindler v. Johnson & Johnson Corp.*,
    2011 WL 12557884 (N.D. Cal. Aug. 1, 2011) ................................................................14

*In re Suboxone Antitrust Litig.*,
    2017 WL 4642285 (E.D. Pa. Oct. 17, 2017) ................................................................20

*Teague v. Bayer AG*,
    195 N.C. App. 18 (N.C. Ct. App. 2009) ................................................................12

*United States v. Am. Express Co.*,
    838 F.3d 179, 204 (2d Cir. 2016) ................................................................18

*Universal Grading Serv. v. eBay*,
    2012 WL 70644 (N.D. Cal. Jan. 9, 2012) ................................................................14

*Volkswagen Grp. of Am., Inc. v. Smartcar, Inc.*,
    2024 WL 4312217 (N.D. Cal. Sept. 25, 2024) ................................................................13

**Statutes**

The Sherman Act,
    15 U.S.C. § 1, *et seq.* ................................................................ *passim*

California Cartwright Act,
    Cal. Bus. & Prof. Code § 16700, *et seq.* ................................................................3, 4, 11

California Unfair Competition Law,
    Cal. Bus. & Prof. Code § 17200, *et seq.* ................................................................4, 20

Florida Antitrust Act,
    Fla. Stat. § 542.15, *et seq.* ................................................................11

Florida Deceptive and Unfair Trade Practices Act,
    Fla. Stat. § 501.201, *et seq.* ................................................................20

Minnesota Antitrust Law,
    Minn. Stat. § 325D.49, *et seq.* ................................................................12, 13

Minnesota Uniform Deceptive Trade Practices Act,
    Minn. Stat. § 325.D.44, *et seq.* ................................................................20

North Carolina Antitrust Act,
    N.C. Gen. Stat. § 76-1, *et seq.* ................................................................12

Oregon Antitrust Act,
    Or. Rev. Stat. § 646.725, *et seq.* ................................................................11, 12

Oregon Unlawful Business or Trade Practices Act,
    Or. Rev. Stat. § 646.607, *et seq.* ................................................................20

**INTRODUCTION**

Plaintiffs' Amended Complaint does not cure the lack of standing that caused this Court to dismiss Plaintiffs' original complaint nor any of the other defects that provide independent bases for dismissal.  Instead, the Amended Complaint doubles down on Plaintiffs' defective theory that a pair of so-called antidiscrimination provisions (the "ADPs") in PayPal's User Agreement have inflated the prices paid by every consumer on every eCommerce transaction with every merchant in the United States, including purchases made using other payment methods.

The Court rejected that theory and dismissed the original complaint because Plaintiffs did not allege an antitrust injury arising from the ADPs and failed to establish that they are the appropriate parties to challenge them.  The Court held that Plaintiffs lack standing because they "do not adequately allege that the injury described flows from the allegedly unlawful conduct."  (ECF No. 64 at 4.)  As the Court explained, Plaintiffs' theory of harm "is too attenuated because it necessarily depends on the independent actions of millions of merchants choosing to provide discounts for customers that do not use PayPal." (*Id.* at 5.)

Tellingly, Plaintiffs' Amended Complaint relies on the *same* attenuated theory of harm that continues to depend on the *same* independent actions of millions of merchants.  It also does not contain any additional *facts* showing that Plaintiffs paid more for any goods or services as a result of the ADPs.  Instead, it adds citations to economic theory, regulatory filings, and merchant testimony that support the unremarkable proposition that many merchants attempt to pass their costs (including payment processing costs) on to consumers. But these additional citations do not address—much less cure—the fundamental defect that led to dismissal of the first complaint:  Plaintiffs rely on a speculative and attenuated chain of causation that does not connect the ADPs to the prices Plaintiffs paid using other payment methods and that depends on independent actions by other payment processors and millions of merchants.

Implicitly recognizing that they cannot establish federal antitrust standing, Plaintiffs also added new claims under the laws of four states in the hope that this Court will find that

some state, somewhere, would permit their attenuated theory to proceed. But the antitrust laws in these states have similar standing requirements that do not permit claims based on attenuated and speculative chains of causation. (Section I.B.)

Apart from the lack of standing, PayPal's original motion to dismiss confronted Plaintiffs with a host of defects, none of which are remedied in the Amended Complaint, thus providing additional, independent grounds for dismissal of Plaintiffs' antitrust claims.

*First*, Plaintiffs fail to properly define, as they must, a relevant antitrust market. The sole market they identify—the "eCommerce Market"—purportedly includes all goods and services sold in the U.S. by any merchant over the internet and is therefore impermissibly defined without reference to basic and indispensable antitrust principles, such as the rule of reasonable interchangeability. Furthermore, PayPal does not even compete in this market, and it is thus irrelevant for the purpose of examining PayPal's conduct. (Section II.A.)

*Second*, Plaintiffs do not adequately allege that PayPal wields market power within the eCommerce Market or any other, nor could they. And there is no legal basis for Plaintiffs' attempt to instead impute merchants' purported market power to PayPal. (Section II.B.)

*Third*, Plaintiffs fail to sufficiently allege that PayPal's ADPs, which simply seek to ensure equal treatment and a level playing field, harm competition. And Plaintiffs still fail to plead, as they must, a two-sided market and anticompetitive impacts on such a market as a whole. (Section II.C.)

Finally, recognizing that their antitrust claims are defective, Plaintiffs again seek to recast them as consumer protection claims. This effort is futile. This Court already dismissed Plaintiffs' California consumer protection claim as duplicative of Plaintiffs' antitrust claims. (ECF No. 64 at 7-8.) The Amended Complaint's new consumer protection claims are equally duplicative and should likewise be dismissed. (Section III.)

## BACKGROUND AND PROCEDURAL HISTORY[2]

### I.    PayPal's Digital Payments Platform and Its User Agreement

PayPal operates a payment platform that enables consumers to purchase goods and services online and merchants to accept electronic payments. (¶¶ 29–30.[3])  Merchants that accept PayPal as one means of payment (and consumers who create PayPal accounts) agree to PayPal's User Agreement as a condition of their use of PayPal.  (¶ 36.)  The standard User Agreement contains a pair of provisions—the ADPs—designed to protect consumer choice. The "no surcharge" provision provides that merchants "agree that [they] will not impose a surcharge or any other fee for accepting PayPal as a payment method."  (¶ 37.)  The "presentation" provision provides that merchants that choose to accept PayPal will present PayPal "on par with" other payment methods and not discriminate against PayPal by burying it in a payment flow.  (¶ 39.)  Together, the ADPs simply ask merchants to present PayPal to consumers on the same terms as they present other payment methods.

The User Agreement does not preclude eCommerce merchants from accepting other payment platforms, and eCommerce merchants accept "other methods of payment, including payment cards and other digital wallets[,]" as a matter of common practice in order "[t]o reach as many consumers as possible."  (¶ 31.)

### II.    The Original Complaint and the Court's Order Dismissing It

Plaintiffs' original complaint challenged the ADPs under the Sherman Act, California Cartwright Act, and California Unfair Competition Law ("UCL").  (ECF No. 1.)  Plaintiffs alleged that the ADPs unlawfully increase prices on all goods and services sold online—even when consumers do not use PayPal—because absent the ADPs:  (1) merchants would naturally provide discounts to customers who use cheaper payment methods and (2) competing payment gateways would lower their merchant fees and merchants would in turn lower their prices in the form of commensurate discounts.  PayPal filed a comprehensive motion to dismiss the

---

[2] The following facts are taken from the Amended Complaint and the materials Plaintiffs "refer[] extensively to" therein.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).  PayPal assumes these facts to be true only for purposes of this motion.

[3] Citations in the form "¶ __" are to paragraphs of the Amended Complaint.  (ECF No. 67.)

original complaint for (1) lack of standing and (2) failure to state a claim.  (ECF No. 49-1.)

The Court dismissed Plaintiffs' Sherman Act claim, holding that their alleged injuries "are too indirect and speculative to maintain antitrust standing[.]"  (ECF No. 64 at 7.)  As to the theory that without the ADPs merchants would offer discounts based on a consumer's method of payment, the Court held that it "is too attenuated because it necessarily depends on the independent actions of millions of merchants" and that "[i]t does not necessarily follow that absent the ADPs, millions of merchants would naturally decide to offer specific discounts for customers who choose not to use PayPal[.]"  (*Id.* at 5.)  As to the theory that, but for the ADPs, all consumers would face lower prices, the Court held that it was "more attenuated than the first" because, in addition to relying on assumptions about merchant behavior, it "further relies on the assumption that absent the ADPs, rival payment processors would lower their prices to benefit from merchant steering."  (*Id.* at 5–6.)  The Court dismissed Plaintiffs' Cartwright Act claim for the same reasons (*id.* at 7), and also held that Plaintiffs failed to state an independent claim under the UCL (*id.* at 7–8).

### III.    The Amended Complaint

The Amended Complaint reasserts the same theories and claims as the original complaint, and again seeks damages for unspecified "overcharges" allegedly incurred on all internet transactions since October 2019 and an injunction against the ADPs.  Other than a handful of additional paragraphs alleging that payment processing costs, like other costs, are to varying degrees passed on to consumers where competitive conditions permit (¶¶ 59–75; *see also* ECF No. 69), the Amended Complaint's factual allegations are virtually identical.  The Amended Complaint also adds four new Plaintiffs who assert new state-law antitrust and consumer protection claims under the laws of Florida, Oregon, North Carolina, and Minnesota.

### <u>ARGUMENT</u>

### I.    The Amended Complaint Does Not Cure Plaintiffs' Lack of Antitrust Standing

Antitrust standing is an indispensable requirement for an antitrust claim.  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 & n.31 (1983) ("*AGC*").  Thus, it is "mandatory" for Plaintiffs to plausibly allege that the harm they

"suffered or might suffer from [PayPal's alleged] practice[s]" constitutes "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts [purportedly] unlawful."[4] *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 456 (9th Cir. 2021). Plaintiffs must also demonstrate that, in addition to suffering an antitrust injury, they are "proper part[ies] to pursue the claim" asserted. *Id.* at 448. The Amended Complaint does not cure the standing defects the Court recognized in dismissing the original complaint, nor does it establish Plaintiffs' standing to assert their state antitrust law claims.

### A.    Plaintiffs Have Not Established Standing Under *AGC*

Antitrust standing under the Sherman Act is governed by the *AGC* factors, under which a plaintiff must first establish that she has suffered an antitrust injury and then establish that she is the proper party to pursue the claim, based on an assessment of: (1) the "directness or indirectness of the asserted injury," (2) the "speculative measure of the harm," (3) the "risk of duplicative recovery," and (4) the "danger of complex apportionment of damages." *AGC*, 459 U.S. at 540–44, 49. The Court held that Plaintiffs neither pleaded an antitrust injury nor established that they were the proper parties to pursue their claims, which "are too indirect and speculative to maintain antitrust standing." (ECF No. 64 at 4–7.) The Amended Complaint does not cure these deficiencies.

#### 1.    Plaintiffs' alleged injuries are not antitrust injuries

The Amended Complaint fails to plead that Plaintiffs personally suffered any injury or that any alleged injuries flowed from PayPal's ADPs (*i.e.*, the allegedly unlawful conduct) and thus fails to allege an antitrust injury. Antitrust injury is a *necessary* component of antitrust standing. *See City of Oakland*, 20 F.4th at 456. To be an antitrust injury, an injury must (1) be personally suffered by the plaintiff, (2) flow from unlawful competitive conduct, and (3) be of a type the antitrust laws were intended to prevent. *See Kelsey K. v. NFL Enters. LLC*, 2017 WL 3115169, at *5 (N.D. Cal. July 21, 2017) (dismissing complaint "conspicuously and suspiciously silent on key facts" required to plausibly infer antitrust injury).

*First*, Plaintiffs again do not allege *what products and/or services they bought*, *for how*

---

[4] Unless otherwise indicated, internal quotation marks and citations are omitted.

*much*, or *from whom*, and instead allege only that they have each purchased at least 50 unspecified items from unspecified internet retailers since 2019.  (¶ 100.)  This new allegation is meaningless, and once again does not provide any form of comparison to the price of the same goods sold by merchants that do not accept PayPal, such that the Court could infer that PayPal-accepting merchants charge higher prices.  This type of conclusory pleading is, as before, insufficient to establish injury.  *See Somers v. Apple, Inc.*, 729 F.3d 953, 964 (9th Cir. 2013) (rejecting plaintiff's argument that she "suffered injury in the form of inflated music prices" because she did "not allege that Apple's music price changed").

*Second*, the Amended Complaint's new allegations *directly undercut* the mechanism of Plaintiffs' unspecified purported injuries.  Specifically, Plaintiffs claim that PayPal's alleged 3.5% fees set a "price floor" below which other payment gateways will not lower their payment fees because of the ADPs (¶ 64), yet Plaintiffs' cited sources reflect average transaction fees of 2.26% (¶¶ 66, 72), well below the purported price floor they claim injured them.  Plaintiffs' "price floor" claims are simply not plausible in the face of the allegations that the average transaction fees are 35% less than their alleged "floor."

*Third*, the Amended Complaint fails to plausibly allege that Plaintiffs' purported injuries *flow from PayPal's ADPs* (*i.e.*, the alleged unlawful conduct) and not any of the myriad other factors that impact the prices of consumer goods.  The Amended Complaint attempts to bridge this gap by adding a smattering of citations to economic literature, regulatory filings, and the testimony of merchants in other litigations (¶¶ 63–75) for the milquetoast proposition that eCommerce and other merchants are incentivized to pass on costs, including payment processing fees, to consumers where competitive conditions and other market factors allow.  These allegations are aimed at the wrong target, and they do not come close to plausibly alleging that *PayPal's fees*, *specifically*, are baked into the price of every single transaction consummated with a PayPal-accepting merchant, regardless of the payment method used or the good or service sold, *because of the ADPs* (or otherwise).  Indeed, as the Court recognized, no such link is possible because any impact of PayPal's ADPs on consumer prices necessarily depends on the intervening independent decisions of millions of eCommerce

merchants, as well as the actions of other payment gateways.  (ECF No. 64 at 5–6.)

2.    Plaintiffs' alleged injuries are incurably speculative and indirect

As the Court recognized in dismissing the original complaint, both of Plaintiffs' theories of injury are too indirect and speculative to confer antitrust standing.  Plaintiffs' first theory—that absent PayPal's ADPs, eCommerce merchants would "offer specific discounts for customers who choose not to use PayPal" (*id.* at 5)—depends on the unwarranted assumption that millions of independent eCommerce merchants would in fact offer such discounts.  (*Id.*)  And Plaintiffs' second theory—that PayPal's rival payment platforms would reduce transaction fees to win eCommerce transactions—"is more attenuated than the first" because it "further relies on the assumption that absent the ADPs, rival payment processors would lower their prices to benefit from merchant steering." (*Id.* at 5–6.)

The Amended Complaint fails to cure these defects because it does not provide plausible factual allegations addressing the intervening, independent decisions of *either* merchants or rival payment platforms.  Plaintiffs cannot and have not alleged facts that would support their implausible assumption that, absent PayPal's ADPs, millions of independent eCommerce merchants would invariably and consistently offer discounts to consumers who opt to use purportedly lower-cost payment methods across all the goods and services they sell. As the Court observed, "It does not necessarily follow that absent the ADPs, millions of merchants would naturally decide to offer specific discounts for customers who choose not to use PayPal[.]"  (*Id.*at 5.)  Multiple defects in Plaintiffs' untenable assumptions are clear from the face of the Amended Complaint.

*First*, as the Amended Complaint acknowledges, a merchant's pricing decisions— including responses to costs—depend on the competitive conditions the merchant faces. (¶ 75.)  Contrary to Plaintiffs' conclusory allegations that all eCommerce merchants are likely to respond to payment processing costs in the same way because "eCommerce margins are famously thin" (*id.*), the unprecedentedly broad proposed eCommerce market includes millions of merchants selling millions of products and services on the internet, each of which is subject to different competitive conditions and dynamics.  Plaintiffs ask the Court to draw

the implausible assumption that the same dynamic competitive conditions permeate across all of these millions of merchants, products, and services and uniformly affect eCommerce merchants' decisions to pass-through or absorb variable costs like transaction fees, and that merchants would consistently respond to the absence of PayPal's ADPs by discounting.

The few factual allegations that the Amended Complaint does include highlight the absurdity of this assumption.  Plaintiffs present statistics for a handful of carefully selected food and other commodity products—such as coffee, processed cheese, gasoline, and cement—purporting to show that costs for these products are passed through at high rates. (¶ 69.)  Even within this group of hand-selected commodities, purported pass-through rates range widely, from 72% to 165%, demonstrating that merchants' ability and inclination to pass costs to consumers varies widely from good-to-good (to say nothing of from merchant-to-merchant).  (*Id.*)  And Plaintiffs' proposed eCommerce Market extends far beyond simple commodities to millions of other products and services, including products manufactured and sold by actual or near monopolists who need not engage in aggressive price competition and unique products and services for which there are a limited number of interchangeable goods (*e.g.*, brand-name fashion and technology products).  In any event, these allegations do nothing to tie *PayPal's ADPs* to the prices consumers pay using other payment methods.

Plaintiffs' cherry-picked quotations from merchant testimony in other cases also undercut Plaintiffs' theory.  Specifically, *none* of the merchant representatives testified that, absent ADPs, they would offer discounts based on payment method or "steer" as Plaintiffs posit they would.  Instead, the merchants each testified that they *may* react to reductions in transaction fees by reducing consumer prices based on their overall costs and competitive conditions.  For example, Walgreens testified that it would react to reduced transaction fees by "look[ing] at [its] *total costs* in totality and go[ing] ahead and *set[ting] retail prices*,"  and Crate & Barrel testified that it would "look to" lower its prices.  (¶ 67 (emphasis added).)  Taken together, this out-of-context testimony from brick-and-mortar retailers does nothing more than support the uncontroversial notion that consumer prices are to some degree based on merchant costs.  More importantly, the testimony further confirms that price-setting is a highly

1    individualized process based on merchant-specific competitive conditions and cost structures.

2    Indeed, Plaintiffs' repeated assertions that the eCommerce marketplace is fiercely competitive

3    (*e.g.*, ¶¶ 75, 98) completely undermine their arguments because Plaintiffs have no explanation

4    as to how merchants that accept PayPal could profitably charge (or why consumers would pay)

5    higher prices for the same goods and services than merchants that do not accept PayPal.  Put

6    simply, Plaintiffs' preposterously broad and diverse proposed market prevents the Court from

7    intelligibly analyzing how individual eCommerce merchants would respond to payment

8    processing costs, much less *in the absence of PayPal's ADPs*, or whether those responses

9    would consistently include discounts.  *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours*

10   *& Co.*, 2015 WL 4755335, at *17 (N.D. Cal. Aug. 11, 2015) (holding that "the market of

11   Architectural Coatings is so broad, and the array of products covered by that term so varied,

12   that Plaintiffs cannot plausibly assert an ability to trace the alleged overcharges through the

13   distribution chains with respect to each of the products at issue," and dismissing for lack of

14   antitrust standing).  This Court should not "ignore obvious realities about competition" to save

15   Plaintiffs' claim.  *See In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Practices*

16   *Litig.*, 275 F. Supp. 3d 218, 225 (D.D.C. 2017).

17        *Second*, the Amended Complaint more plausibly suggests that broad swaths of

18   Plaintiffs' proposed eCommerce Market would *not* respond to the absence of PayPal's ADPs

19   by offering discounts based on payment method.  Notwithstanding Plaintiffs' bald assertion

20   that "payment processing fees are a substantial cost for merchants and, as such, changes in

21   these fees are particularly likely to be reflected in retail prices," the figures Plaintiffs cite

22   demonstrate that payment fees are, on average, 2-3% of a transaction.  (¶ 72 & n.63.)  And the

23   allegedly incremental fees merchants pay on PayPal transactions represent a small fraction of

24   those already small amounts.  The relatively small cost of payment fees further suggests that it

25   is implausible that payment fees predictably impact consumer prices or that merchants would

26   consistently or uniformly respond to the absence of PayPal's ADPs by discounting based on a

27   consumer's payment method.

28        As this Court recognized in *Jones v. Micron Tech. Inc.*, whether the final price of an

end-product absorbs or passes on fluctuations in the price of an input depends on, among other things, the input's cost relative to the total costs.  400 F. Supp. 3d 897, 908 & n.2 (N.D. Cal. Sept. 3, 2019).  Where an input's cost reflects a significant or substantial portion of the product's overall cost, it is more likely that the end-product's cost will be "dependent upon or tied to" the cost of the contested input, whereas changes in the costs of an input that represent a miniscule cost relative to the whole are less likely to be reflected in the price of the end-product.  *Id.*  PayPal's payment processing fees represent a very small portion of the overall costs of eCommerce transactions, and there is therefore no basis for an inference that they have a consistent and uniform effect on consumer prices in eCommerce or that merchants would consistently discount their prices for transactions using other payment methods in the absence of PayPal's ADPs.  *Id.* at 913 (dismissing for lack or standing where plaintiffs did not allege how allegedly inflated price of one component interacted with "numerous other components, all of which *collectively* determine the final price actually paid by plaintiffs for the final product"); *see also In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *7 (D.N.J. Oct. 20, 2011) (dismissing for lack of standing where price of component would have "minimal foreseeable effect" on price of end-product containing only "trace amounts" of the component).

The uncertainties inherent in attributing an end-product price impact to a change in price of one very small input among many others are further compounded under Plaintiffs' expansive theory, which assumes a price impact for all end-products (transactions), *even those that do not even involve the "input"* (*i.e.*, are not consummated with PayPal).  For example, a computer manufacturer that uses chips in all of its products *may* react to a chip price increase by consistently passing along some portion of that increase to consumers (and even that dynamic may be too speculative to support antitrust standing).  PayPal-accepting merchants are situated drastically differently in that PayPal's fees are assessed on only transactions consummated with PayPal.  Whether and how a merchant "spreads" any marginally higher PayPal fees across non-PayPal transactions is likely to depend, among other things, on how much of a merchant's transaction volume is processed through PayPal.  Yet Plaintiffs' theory

simply assumes, without factual basis, that a merchant that processes even a single payment through PayPal (i) would pass through PayPal's fees (or the amount those fees exceed fees for other forms of payment) on non-PayPal transactions and (ii) that it would not do so but for the ADPs. These assumptions defy economic logic and common sense.

There is also no well-pleaded factual basis to support the additional assumption underlying Plaintiffs' second theory of harm: That absent PayPal's ADPs, rival payment processors would lower their transaction fees, enabling eCommerce merchants to discount based on payment method and lowering consumer prices across the board. Indeed, Plaintiffs studiously attempt to avoid even *mentioning* obvious rival payment platforms for fear of undercutting their cursory claims of PayPal's dominance, much less alleging facts about their pricing structures, how those structures are impacted by PayPal's ADPs, or how those structures would change in the absence of PayPal's ADPs. Because this theory—which the Court recognized as even "more attenuated than the first"—is simply recycled wholesale in the Amended Complaint, it again cannot support antitrust standing. (ECF No. 64 at 5.)

**B.      Plaintiffs Lack Standing To Assert Their State Antitrust Law Claims**

In an effort to avoid the Court's ruling that they lack antitrust standing under federal and California law,[5] Plaintiffs assert new claims based on the same theories under the antitrust laws of Florida, Oregon, North Carolina, and Minnesota. Antitrust standing under the laws of these states does not extend to claims as remote and speculative as Plaintiffs' claims here.

Florida. Florida courts interpreting the Florida Antitrust Act have held that its standing requirements are coextensive with the standing requirements of a Sherman Act claim. *See Mack v. Bristol-Myers Squibb Co.*, 673 So.2d 100, 102 (Fla. Dist. Ct. App. 1996) ("[T]he standing requirements for a private cause of action under the Florida Antitrust Act parallel the standing requirements of Section 4 of the Clayton Act."). Accordingly, Plaintiffs' Florida Antitrust Act claim should be dismissed for lack of standing.

---

[5] As the Court recognized, the Cartwright Act mirrors the Sherman Act, including as to standing. Because the Amended Complaint's Cartwright Act claim continues to rest on the same allegations as their Sherman Act claim, Plaintiffs lack standing under the Cartwright Act for the same reasons. (ECF No. 64 at 7.)

<u>Oregon</u>.   The Oregon courts have not provided definitive guidance regarding the scope of antitrust standing under Oregon law and certainly have not embraced an expansive conception of standing that would authorize Plaintiffs' claims.   Moreover, the Oregon Antitrust Act contains a harmonization provision that provides that "[t]he decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority" in its construction.   Ore. Rev. Stat. § 646.715.   Consistent with the Oregon legislature's instructions, and in the absence of guidance from the Oregon courts, this Court should apply federal antitrust standing principles and the *AGC* factors to Plaintiffs' Oregon law antitrust claim, as several other federal courts have done.[6]   Accordingly, Plaintiffs' Oregon antitrust claim should be dismissed.

<u>North Carolina</u>.   The North Carolina Supreme Court has yet to provide definitive guidance regarding the scope of antitrust standing under North Carolina law.   In the absence of such guidance, federal courts have applied the *AGC* factors to North Carolina antitrust claims, as has a North Carolina trial court.[7]   One intermediate appellate court, in an indirect purchaser case, has declined to apply the *AGC* factors and instead applied a proximate causation standard. *Teague v. Bayer AG*, 195 N.C. App. 18, 26 (N.C. Ct. App. 2009).   This Court need not resolve this debate because even the North Carolina appellate court that declined to apply the *AGC* standard opined that plaintiffs who were allegedly damaged through "inflated cost of goods sold by merchants who were injured by Visa's and MasterCard's inflated cost of financial services" lacked standing because they "were not consumers or competitors in the allegedly restrained market, nor were the plaintiffs indirect purchasers in that the plaintiffs did not end up with a

---

[6] *Carefirst of Md., Inc. v. Johnson & Johnson*, 2024 WL 3858249, at *19 & n.23 (E.D. Va. Aug. 16, 2024) (applying *AGC* factors to Oregon antitrust claim); *In re Interior Molded Doors Antitrust Litig.*, 2019 WL 4478734, at *16 (E.D. Va. Sept. 18, 2019) (same); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 545 (N.D. Ill. 2019) (same).   While *Oliver v. American Express Co.* declined to apply *AGC* to Oregon antitrust claims, it did not identify an alternative standing test under Oregon law.   2020 WL 2079510, at *15–16 (E.D.N.Y. Apr. 30, 2020)

[7] *Interior Molded Doors*, 2019 WL 4478734, at *15; *In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *15 (N.D. Ill. June 29, 2015); *Crouch v. Crompton Corp.*, 2004 WL 2414027, at *18–19 (N.C. Super. Ct. Oct. 28, 2004) (applying *AGC* factors in light of harmonization statute).

1    product supplied by the defendants."[8]  *Id.*  Plaintiffs lack standing under either standard.

2        <u>Minnesota</u>.  The Minnesota Supreme Court has adopted an antitrust standing test similar

3    to the *AGC* factors, which considers "foreseeability, proximate cause, remoteness, and relation

4    of the injury to the purposes of the antitrust laws" to cabin the scope of antitrust liability under

5    Minnesota antitrust law.  *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 631 (Minn. 2007).  In so

6    holding, the Minnesota Supreme Court expressly stated that claims like Plaintiffs' are

7    insufficient to confer standing, re-affirming *Gutzwiller v. Visa U.S.A., Inc.*'s holding that

8    plaintiffs who "alleged that the overcharges forced upon merchants by Visa and Mastercard were

9    passed on to consumers in the form of higher prices on essentially every good sold in the state

10   of Minnesota" were an example of an injury "too remote and speculative to afford standing."

11   *Id.* at 632 (citing 2004 WL 2114991, at *2, 6 (Minn. D. Ct. Sept. 15, 2004)).  Plaintiffs therefore

12   lack standing under Minnesota law.

13   **II.      The Amended Complaint Does Not State an Antitrust Claim**

14       Even if Plaintiffs had antitrust standing, they fail to allege any of the necessary

15   elements to state a claim under Section 1 of the Sherman Act (or its state law equivalents).[9]

16       **A.      The Proposed "eCommerce Market" Is Not an Antitrust Market**

17       "A threshold step in any antitrust case is to accurately define the relevant market," or

18   the "area of effective competition."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir.

19   2020).  Without an adequately alleged relevant antitrust market, "there is no way to measure

20   the defendant's ability to lessen or destroy competition."  *Ohio v. Am. Express Co.*, 585 U.S.

21   529, 543 (2018).  Courts within the Ninth Circuit "regularly grant [Rule] 12(b)(6) motions

22   based on failure to adequately allege a relevant market."  *See Volkswagen Grp. of Am., Inc. v.*

---

24   [8] *Oliver* declined to dismiss for lack of standing under North Carolina law, but it did not
     address—and the parties did not brief—this aspect of *Teague*.

25   [9] Plaintiffs' state antitrust claims have the same elements as, and rise and fall with, their
     Sherman Act claim.  *See Cnty. of Toulumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th
26   Cir. 2001) (California); *McArthur Dairy, LLC v. McCowtree Bros. Dairy, Inc.*, 2011 WL
     2118701, at *9 (S.D. Fla. May 27, 2011) (Florida); *Sherr v. HealthEast Care Sys.*, 262 F.
27   Supp. 3d 869, 886–87 (D. Minn. 2017) (Minnesota); *Cole v. Champion Enters., Inc.*, 496 F.
     Supp. 2d 613, 634–36 (M.D.N.C. 2007) (North Carolina); *Ford v. Cascade Health Servs.*,
28   2004 WL 1445523, at *3 n.5 (D. Or. June 25, 2004) (Oregon).

*Smartcar, Inc.*, 2024 WL 4312217, at *8 (N.D. Cal. Sept. 25, 2024) (collecting cases).

Plaintiffs' proposed eCommerce Market—which includes the limitless array of retail products and services available for purchase in the U.S. online—suffers from the same two independently fatal defects identified in Defendants' first comprehensive motion to dismiss: The proposed eCommerce Market is defined without any reference to the reasonable substitutability of the products within it and neither PayPal nor its rivals compete within it. The eCommerce Market is therefore not a relevant antitrust market here.

1.    The "eCommerce Market" is inconsistent
with fundamental principles of market definition

"The principle most fundamental to product market definition is cross-elasticity of demand for certain products or services." *Coronavirus Rptr. v. Apple, Inc.*, 85 F.4th 948, 955 (9th Cir. 2023). A plaintiff must thus plead both that the products or services within an alleged market are "reasonably interchangeable," and that consumers would switch to one of the products or services in the alleged market in response to a price increase for another within that market. *Spindler v. Johnson & Johnson Corp.*, 2011 WL 12557884, at *3 (N.D. Cal. Aug. 1, 2011). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand . . . the relevant market is legally insufficient." *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1109 (N.D. Cal. 2022).

Plaintiffs still do not even attempt to demonstrate that the innumerable products and services encompassed by the proposed eCommerce Market are reasonably interchangeable with one another for the same purpose. This failure alone precludes Plaintiffs' antitrust claims. *See Coronavirus*, 85 F.4th at 955 (dismissing Section 1 claim with prejudice where complaint "d[id] not even attempt to demonstrate" cross-elasticity of demand). The Ninth Circuit, this Court, and other trial courts in this Circuit have dismissed Sherman Act claims that allege far narrower product markets and depend on far less fanciful assumptions about substitutability.[10]

---

[10] *E.g.*, *Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.*, 2010 WL 1541257, at *4–5 (N.D. Cal. Apr. 16, 2010) ("prescription pharmaceutical" market unsustainable because all prescription drugs are not interchangeable), *aff'd* 433 F. App'x 598, 599 (9th Cir. 2011); *Universal Grading Serv. v. eBay*, 2012 WL 70644, at *7 (N.D. Cal. Jan. 9, 2012) ("online auctions" market unsustainable because "millions of items sold through eBay" are not interchangeable).

Because they cannot possibly satisfy the rule of reasonable interchangeability, Plaintiffs have instead argued that the eCommerce Market is defensible because it has the "practical indicia" of a distinct market under *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). But Plaintiffs are mistaken that *Brown Shoe* provides an alternative basis to allege a primary market, rather than *submarkets*. *See Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291–92 (9th Cir. 1979) ("Authorities far too numerous to cite or discuss in detail have established that . . . [t]he principle most fundamental to product market definition is cross-elasticity of demand."); *cf. In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 985–87 (C.D. Cal. Mar. 23, 2012) (observing the Ninth Circuit has *never held* that practical indicia alone can define primary market). District courts in this Circuit have rejected similar ploys to evade the rule of reasonable interchangeability based on unfounded reliance upon *Brown Shoe*.[11]

### 2. PayPal's conduct cannot be evaluated in the "eCommerce Market"

"The first step in any antitrust case is to accurately define the relevant market in which the defendant competes." *Pac. Steel Grp. v. Com. Metals Co.*, 600 F. Supp. 3d 1056, 1067 (N.D. Cal. 2022). "The focus in defining a relevant product must be upon recognizing those firms and products which present relevant alternatives to the defendant's product[.]" *In re Data Gen. Corp. Antitrust Litig.*, 529 F Supp 801, 809 (N.D. Cal. 1981). A properly defined market must enable a Court to "measure the defendant's ability to lessen or destroy competition." *See Ohio*, 585 U.S. at 543.

The proposed eCommerce Market is the wrong framework to evaluate PayPal's conduct, as it fails to encompass PayPal's payments platform and those of its rivals. Instead, it encompasses goods and services sold by individual merchants and bought by consumers. There is no way to measure PayPal's "ability to lessen or destroy competition" in this market because PayPal does not buy or sell retail goods or services online or prevent others from doing so; to the contrary, PayPal *facilitates* such transactions. *Data Gen.*, 529 F. Supp. at 809

---

[11] *See Reilly*, 578 F. Supp. 3d at 1108–09; *MLW Media LLC v. World Wrestling Ent. Inc.*, 655 F. Supp. 3d 946, 951–52 (N.D. Cal. Feb. 13, 2023) (similar).

1    (a properly defined market must include "those firms and products which present relevant

2    alternatives to defendant's product").  Nor does the proposed market encompass those other

3    two-sided payment platforms, and their products, with which PayPal actually competes.  *Ohio*,

4    585 U.S. at 546 ("Only other two-sided platforms can compete with a two-sided platform.").

5              **B.        Plaintiffs Fail To Plausibly Allege That PayPal Has Market Power**

6              Plaintiffs' claims also should be dismissed because they do not adequately allege

7    PayPal has power within any market.  *See Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th

8    680 (9th Cir. 2022) ("A failure to allege power in the relevant market is sufficient grounds to

9    dismiss an antitrust complaint.").  A plausible demonstration of market power requires

10   allegations that PayPal either "owns a dominant share of" the proposed eCommerce Market, or

11   that "there are significant barriers to entry" and competitors lack capacity to increase short-run

12   output.  *Rebel Oil Co., Inc. v. Atl. Ritchfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

13             PayPal plainly does not wield market power in the vast eCommerce Market—the sole

14   market Plaintiffs propose—in which PayPal does not even compete and which Plaintiffs'

15   counsel simultaneously alleges is dominated by Amazon (which does not even accept PayPal

16   as a payment option).  *See, e.g.*, *Frame-Wilson v. Amazon.com*, *Inc.*, 591 F. Supp. 3d 975,

17   990–92 (W.D. Wash. 2022).  But the Amended Complaint does not even allow for a

18   meaningful assessment of PayPal's market share *in any market*, because it fails to provide any

19   basis for comparison with PayPal's rivals.  Plaintiffs allege that PayPal has 435 million active

20   consumer and merchant accounts across 200 markets and that PayPal processed more than 22

21   billion transactions in 2022 with a transaction volume exceeding $1.36 trillion.  (¶ 25.)  These

22   figures are meaningless for two reasons.  *First*, the ubiquity of "multihoming"—the practice of

23   eCommerce merchants accepting numerous payment methods as a matter of practice to ensure

24   the broadest consumer reach possible (*see* ¶ 31)—renders it entirely plausible that PayPal's

25   rivals maintain an equal or even more robust base of merchant and consumer subscribers and

26   process more eCommerce transactions or transaction volume.  *See Ohio*, 585 U.S. at 537–38

27   (noting that Discover was accepted by 3 million more merchants than Amex yet had roughly

28   one-fifth of Amex's market share by payment volume).  *Second*, the Amended Complaint

1    entirely omits any figures that would enable even a rudimentary comparison between PayPal

2    and its rivals for eCommerce transactions, such as PayPal's share of overall transaction

3    volume or the transaction volumes of PayPal's rivals.  Without this information, PayPal's

4    market share cannot be deciphered.  *See id.* at 545 (holding that payment platforms "determine

5    their market share by measuring the volume of transactions sold").

6        Plaintiffs do not plead these facts because they undercut their claims of PayPal's

7    purported dominance.  Instead, Plaintiffs seek to aggregate the market shares of all PayPal-

8    accepting eCommerce merchants and impute those shares to PayPal.  There is no legal basis

9    for aggregating individual merchants' total sales volumes using all payment methods—not just

10   PayPal—and imputing them as market share to PayPal where, as here, there are no underlying

11   allegations of abusive practices or horizontal agreement or conspiracy.[12]

12       Unable to allege market power through market-share allegations, Plaintiffs would have

13   to allege facts plausibly suggesting that "there are significant barriers to entry" in the

14   eCommerce Market and that "existing competitors lack the capacity to increase their output in

15   the short run."  *Rebel Oil*, 51 F.3d at 1434.  The Amended Complaint does the opposite and

16   instead alleges that eCommerce growth is "skyrocket[ing]" and "fast pace[d]."[13]

17       **C.    Plaintiffs Do Not Plausibly Allege the User Agreement Is Anticompetitive**

18       To state a rule of reason claim, Plaintiffs must plausibly allege that a "contract,

19   combination, or conspiracy" unreasonably restrains trade and "actually injures competition."

20   *Brantley*, 675 F.3d at 1197.  This requires more than bare recitals that "competition has been

---

[12] *See, e.g.*, *Brantley v. NBC Universal, Inc.*, 2008 WL 11338585, at *3 n.3 (C.D. Cal. Mar. 10, 2008) (rejecting attempt to "aggregate the effects of defendants' actions" to establish market power "even though they are alleged to have acted independently and not collectively"); *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 622 (S.D.N.Y. 2013) (prohibiting plaintiffs from imputing to Amazon the market share of publishers "because plaintiffs only allege[d] that each individual Publisher entered into an unlawful vertical agreement with Amazon, making no allegation of any horizontal conspiracy."); *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2024 WL 918030, at *7 (S.D.N.Y. Mar. 2, 2024) (similar); *Paddock Pubs., Inc. v. Chi. Tribune Co.*, 1995 WL 632031, at *5, 11 (N.D. Ill. Oct. 25, 1995) (finding cumulative effect of independent vertical agreements may only be considered where there are allegations of abuse or horizontal agreement, collusion, or conspiracy).

[13] U.S. Dep't of Commerce, *New Insights on Retail E-Commerce* (¶ 67 n.31); Statista, *E-commerce in the United States – Statistics & Facts* (¶ 67 n.30).

restrained unreasonably," and a plaintiff must, at a minimum, "sketch the outline of [injury to competition] with allegations of supporting factual detail." *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989). Plaintiffs fail to do so here.

       1.      <u>The ADPs do not restrict competition among merchants or platforms</u>

As the Second Circuit recognized in a similar challenge to Amex's ADPs, such provisions "prevent a merchant from seeking [Amex] cardholders by advertising acceptance of Amex cards but then, at the critical point of sale, offering that clientele a discounted price for not using the Amex card." *United States v. Am. Express Co.*, 838 F.3d 179, 204 (2d Cir. 2016). Amex thus had a "legitimate interest in seeing that cardholders . . . are not enticed to use their Visa or MasterCard by card-connected discounts from merchants." *Id.* The Second Circuit "s[aw] no monopolistic danger in this purpose" because the ADPs protected the aspects of Amex cards that differentiated them from its largest rivals, *i.e.*, Visa and Mastercard, and explicitly noted that "[o]utlawing the [ADPs] would appear to reduce this protection," likely "increasing the market shares of" those larger rivals. *Id.* at 204 & n.51.

PayPal has the same interests here. It is dwarfed by payment solutions offered by larger technology firms and payment cards with far larger networks, which Plaintiffs affirmatively allege PayPal competes with for transactions. (¶¶ 31–33, 45.) To ensure that consumers' experience in using PayPal at the critical point of sale is not inferior to rival options, merchants who choose to accept PayPal agree to treat it equally with rival payment options. That is, PayPal's ADPs facilitate consumer choice by asking merchants that choose to accept PayPal not to discourage consumers from choosing it over rival options controlled by larger firms by surcharging or discriminating against PayPal by burying it in a payment flow. This is good for consumers and PayPal because it ensures that much larger payment providers cannot incent merchants to damage the consumer payment experience by imposing surcharges or other discriminatory treatment and protects PayPal from merchants that do not treat it fairly. Such arrangements are pro-competitive and are the type of conduct the antitrust laws seek to encourage, not condemn.

Plaintiffs also do not and cannot allege the ADPs have any preclusive effect on

competition.  The ADPs do not restrict eCommerce merchants from accepting other payment methods.  To the contrary, Plaintiffs *affirmatively acknowledge* that multihoming is an essential feature of eCommerce merchants' payments processing.  (¶ 31.)  And merchants that do not wish to provide equal treatment to PayPal are free not to accept PayPal at all.  The User Agreement thus does not interfere with competition between or among eCommerce merchants, including "natural" price competition through discounts and/or rebates on goods and services.

Instead, Plaintiffs assert through a speculative and indirect causal chain that the ADPs are "platform MFNs" that cause merchants to pass through PayPal's merchant fees, specifically, to all consumers for all products they sell.  (¶ 48.)  But the Amended Complaint's bare allegations of increased prices are insufficient to show harm to competition.[14]

### 2. Plaintiffs cannot aggregate the purported effects of PayPal's User Agreements with individual merchants

Unable to plausibly allege that any single User Agreement violates Section 1, Plaintiffs attempt to aggregate these individual, vertical agreements to demonstrate that, cumulatively, they harm competition.  This approach is defective.  *First*, because Plaintiffs fail to draw a reasonable inference that any single User Agreement increases prices, reduces output, or restricts competition, the Court need not even consider Plaintiffs' attempt to aggregate the purported cumulative effects of all User Agreements; one User Agreement with no anticompetitive effects multiplied by millions still equals no such effects.  *See Paddock Pubs.*, 1995 WL 632031, at *12 ("The notion that lawful non-collusive conduct . . . added to lawful, non-collusive conduct . . . produces in the aggregate an unlawful effect . . . simply makes no sense.").  *Second*, Plaintiffs' attempt to aggregate purported anticompetitive effects is without legal support.  Courts may not consider the cumulative effects of an agreement where, as here, "injuries allegedly resulted from contracts independently . . . entered into by competitors with a vertical provider of services," and there are no allegations of horizontal conspiracy or

---

[14] *Coronavirus Rptr. v. Apple Inc.*, 2021 WL 5936910, at *4 (N.D. Cal. Nov. 30, 2021) (without more, "increase[ed] [passthrough] prices to consumers" are insufficient because they "may arise for procompetitive reasons"); *Brantley*, 675 F.3d at 1202 ("Even vertical agreements that directly prohibit retail price reductions . . . are not unlawful absent a showing of actual anticompetitive effect.").

collusion.  *Id* at \*11; *see also Dickson v. Microsoft Corp.*, 309 F.3d 193, 210 (4th Cir. 2002) (courts may "not consider the cumulative harm" of discrete vertical agreements).

> 3.  Plaintiffs do not allege anticompetitive
>       effects on both sides of the market

Plaintiffs affirmatively allege that PayPal has all the salient features of a two-sided transaction platform.  (¶ 27.)  To state a claim, Plaintiffs must therefore allege the ADPs have anticompetitive effects *on the market as a whole*.  *Ohio*, 585 U.S. at 546.  Plaintiffs fall short because they fail to proffer any new allegations that plausibly demonstrate the ADPs restrict any payment platforms from competing with PayPal on either side of the market.  *See Coronavirus*, 85 F.4th at 957 (affirming dismissal for failure to define a two-sided market and to allege harm to "the competitive process as a whole").  On the merchant side, Plaintiffs acknowledge PayPal's rivals are routinely accepted alongside it.  (¶ 31.)  And nothing in the Amended Complaint suggests that the ADPs inhibit rivals from competing for consumers in any relevant area, including on value, fees, rewards, promotions, security, or convenience.

## III.    Plaintiffs Fail To Allege Distinct State Law Consumer Protection Claims

Plaintiffs' California UCL claim was dismissed because it was based on the same set of facts as their defective antitrust claims.  (ECF No. 64 at 7–8.)  Rather than alleging *facts* to support any distinct consumer protection claim, Plaintiffs simply pile on four additional *claims.*  These claims fail for two independent reasons.  *First*, they do not satisfy Rule 8(a)'s minimal fair-notice pleading standard because they "merely list[] statutes without articulating specific facts to satisfy each element."  *Monreal v. GMAC Mortg., LLC*, 948 F. Supp.2d 1069, 1076 (S.D. Cal. 2013).  Such shotgun pleading is impermissible.  *In re Suboxone Antitrust Litig.*, 2017 WL 4642285, at \*12–14 (E.D. Pa. Oct. 17, 2017).  *Second*, Plaintiffs' consumer protection claims are entirely based on the same factual allegations as their antitrust claims, and such claims that "mirror deficient federal antitrust law claims" should be dismissed.  *Id.*[15]

### CONCLUSION

As set forth above, the Amended Complaint should be dismissed with prejudice.

---

[15] *See also In re Cattle & Beef Antitrust Litig.*, 687 F. Supp. 3d 828, 845 (D. Minn. 2023); *JES Props., Inc. v. USA Equestrian, Inc.*, 2005 WL 1126665, at \*19 (M.D. Fla. May 9, 2005).

Dated: November 21, 2024          Respectfully submitted,


                                  /s/ *Richard Schwed*
                                  Patrick T. Hein (SBN 254431)
                                  140 New Montgomery Street, 10th Floor
                                  San Francisco, CA 94105-2997
                                  Tel.: (415) 796-4160
                                  patrick.hein@aoshearman.com

                                  Adam S. Hakki (admitted *pro hac vice*)
                                  Richard Schwed (admitted *pro hac vice*)
                                  599 Lexington Ave.
                                  New York, NY 10022
                                  Tel.: (212) 848-4000
                                  adam.hakki@aoshearman.com
                                  rschwed@aoshearman.com

                                  Todd M. Stenerson (admitted *pro hac vice*)
                                  401 9th Street, NW, Suite 800
                                  Washington, D.C. 20004
                                  Tel.: (202) 508-8000
                                  todd.stenerson@aoshearman.com

                                  Rachel Mossman Zieminski (admitted *pro hac vice*)
                                  2601 Olive Street, 17th Floor
                                  Dallas, TX 75201
                                  Tel.: (214) 271-5777
                                  rachel.zieminski@aoshearman.com

                                  ALLEN OVERY SHEARMAN STERLING US LLP

                                  *Attorneys for Defendants PayPal Holdings, Inc. and
                                  PayPal, Inc.*