Ben M. Harrington (SBN 313877)
Abby R. Wolf (SBN 313049)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
benh@hbsslaw.com

Barbara A. Mahoney (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
barbaram@hbsslaw.com

Brian D. Clark (*pro hac vice*)
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
bdclark@locklaw.com

Stephen J. Teti (*pro hac vice*)
LOCKRIDGE GRINDAL NAUEN PLLP
265 Franklin St., Suite 1702
Boston, MA 02110
Telephone: (617) 456-7701
sjteti@locklaw.com

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| CHRISTIAN SABOL, SAMANTHA RUSSELL, LAURA MCKINNEY, CHELCIE BLAKE, GREGORY NOHRENBERG, and STEPHEN PHILLIPS, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>PAYPAL HOLDINGS, INC., a California Corporation, PAYPAL, INC., a California Corporation,<br><br>    Defendants. | Case No. 4:23-cv-5100-JSW<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Judge: Hon. Jeffrey S. White<br>Date:  March 20, 2026<br>Time: 9:00 AM |

**TABLE OF CONTENTS**

Page

I.      PRELIMINARY STATEMENT .................................................................................1

II.     PROCEDURAL BACKGROUND ..........................................................................2

III.    ARGUMENT .............................................................................................................3

      A.    Plaintiffs Allege Standing........................................................................3

           1.    Plaintiffs Allege an Antitrust Injury. .........................................4

           2.    Plaintiffs' Alleged Antitrust Injuries are Direct and
              Nonspeculative. .........................................................................5

                 a.    Plaintiffs Are Direct Purchasers with Standing as Such. ...................5

                 b.    Plaintiffs Allege Causation with Exceptional Specificity. .................6

      B.    Plaintiffs Allege All Elements of a Sherman Act Claim. ............................9

           1.    The Court Has Upheld Plaintiffs' Proposed Relevant
              Market..........................................................................................9

            2.    Plaintiffs Adequately Allege that PayPal Exercises Market
              Power..........................................................................................9

            3.    PayPal's Anti-Steering Rules Have Demonstrable
              Anticompetitive Effects................................................................13

      C.    PayPal Has Not Identified Any Grounds on Which to Dismiss
           Plaintiffs' State Law Claims........................................................................14

IV.     CONCLUSION .........................................................................................................15

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

**Cases**

3

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*,

4
   190 F.3d 1051 (9th Cir. 1999) ........................................................................3, 4, 9

5
*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................3

6

7
*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ...................................................................................12, 13

8
*Brown v. Amazon.com, Inc.*,

9
   No. 22-cv-00965-JHC, 2023 WL 5793303 (W.D. Wash. Sept. 7, 2023)...................3

10
*In re Cal. Gasoline Spot Mkt. Antitrust Litig.*,
   No. 20-cv-03131-JSC, 2022 WL 3215002 (N.D. Cal. Aug. 9, 2022) ......................4

11

12
*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. C-07-5944 JST, 2016 WL 3648478 (N.D. Cal. July 7, 2016) ..........................14

13
*Cent. Valley Med. Grp., Inc. v. Ind. Phys. Assocs. Med. Grp., Inc.*,

14
   No. 19-cv-00404-LJO-SKO, 2019 WL 3337891 (E.D. Cal. July 25, 2019)...........14

15
*Copeland v. Energizer Holdings, Inc.*,
   716 F. Supp. 3d 749 (N.D. Cal. 2024)..............................................................4

16

17
*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) .................................................................9, 10, 14

18
*Frame-Wilson v. Amazon, Inc.*,

19
   591 F. Supp. 3d 975 (W.D. Wash. 2022) .........................................................5, 6

20
*Gibson v. Cendyn Grp., LLC*,
   148 F.4th 1069 (9th Cir. 2025).......................................................8, 11, 12, 14

21

22
*Glen Holly Ent. v. Tektronix, Inc.*,
   343 F.3d 1000 (9th Cir. 2003) .......................................................................4

23
*Hanover Shoe v. United Shoe Mach. Corp.*,

24
   392 U.S. 481 (1968) ......................................................................................5

25
*Nat'l ATM Council, Inc. v. Visa Inc.*,
   No. 21-7109, 2023 WL 4743013 (D.C. Cir. July 25, 2023)..................................13

26

27
*In re Nat'l Football League Sunday Ticket Antitrust Litig.*,
   933 F.3d. 1136 (9th Cir. 2019) ........................................................................5

28

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ...........................................................................................9

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015) ..................................................................................................9

*Off. Cantonal des Faillites de la Republique et du Canton de Geneve v. Expedia, Inc.*,
  No. 23-cv-983-BJR, 2024 WL 381181 (W.D. Wash. Feb. 1, 2024) .................................9

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ..............................................................................................8

*In re Optical Disk Drive Antitrust Litig.*,
  No. 10-md-2143 RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ......................................6

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
  967 F. Supp. 2d 1347 (N.D. Cal. 2013) ...........................................................................11

*Osborn v. Visa Inc.*,
  797 F.3d 1057 (D.C. Cir. 2015) .......................................................................................13

*OSU Student All. v. Ray*,
  699 F.3d 1053 (9th Cir. 2012) ...........................................................................................3

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  714 F. Supp. 3d 65 (E.D.N.Y. 2024) ..........................................................................10, 13

*Pinnacle Armor, Inc. v. United States*,
  648 F.3d 708 (9th Cir. 2011) .............................................................................................3

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022) ............................................................................................13

*Sheahan v. State Farm Gen. Ins. Co.*,
  394 F. Supp. 3d 997 (N.D. Cal. 2019) ...............................................................................9

*Staley v. Gilead Scis., Inc.*,
  446 F. Supp. 3d 578 (N.D. Cal. 2020) .............................................................................13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. M 07-1827 SI, 2012 WL 6709621 (N.D. Cal. Dec. 26, 2012) ....................................6

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*,
  676 F.2d 1291 (9th Cir. 1982) .........................................................................................11

*United States v. Visa U.S.A., Inc.*,
  163 F. Supp. 2d 322 (S.D.N.Y. 2001) .............................................................................10

*In re Webkinz Antitrust Litig.*,
  695 F. Supp. 2d 987 (N.D. Cal. 2010) ..........................................................................9, 12

*William O. Gilley Enters., Inc. v. Atl. Richfield Co.*,
    561 F.3d 1004 (9th Cir. 2009) ................................................................................. 11

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    395 U.S. 100 (1969) .................................................................................................. 9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    PRELIMINARY STATEMENT

To accept PayPal as a means of payment, merchants agree to restraints (hereafter "Anti-Steering Rules") that prevent them from offering discounts when consumers use payment methods other than PayPal. These restraints insulate PayPal from normal price competition. PayPal charges merchants industry-high transaction fees ("gateway fees") but, bound by the Anti-Steering Rules, merchants cannot use discounts to steer customers toward more cost-effective payments platforms. Rival platforms likewise stand to gain little by competing aggressively on gateway fees, because the Anti-Steering Rules prevent merchants from rewarding them by steering transactions to their platforms.  The predictable result is higher industry-wide gateway fees, and higher prices. *See* Second Am. Compl. ("SAC") ¶¶ 52-79, ECF No. 80.

Merchants accede to this fundamental restriction on their pricing freedom knowing that inflated gateway fees are absorbed into their retail prices. Consumers like Plaintiffs ultimately pay these costs. This is confirmed through multiple forms of reinforcing proof, including admissions from identified eCommerce merchants Plaintiffs transacted with. In sworn testimony, these merchants acknowledged that they do not shoulder gateway fees, but instead, cover them by increasing the prices charged to end-consumers—that is, Plaintiffs and the proposed class. *See* SAC ¶ 69. These merchant admissions are reinforced by a wide-ranging body of economic evidence marshalled in the SAC—including economic models, empirical studies, and admissions from other industry participants—demonstrating that PayPal's Anti-Steering Rules lead to supracompetitive gateway fees and retail prices. SAC ¶¶ 52-79.

The SAC contains additional allegations that squarely address the concerns which prompted the Court to dismiss, without prejudice, the FAC. *See* ECF No. 79; *see, e.g.*, SAC ¶¶ 76-77; 100-101, 104-106. With respect to market power, the SAC demonstrates PayPal's dominance vis-à-vis other payment platforms, including with industry reports confirming that PayPal "continue[s] to dominate the market for online payment processing" and appears on "twice the number of domains as its nearest competitor (Stripe)." SAC ¶ 101. With respect to antitrust injury, the SAC incorporates additional allegations regarding eCommerce costs and pricing, including documentation that the "overall cost of building and running a new ecommerce website" can be as low as $29 a month. SAC

1    ¶ 76. PayPal's gateway fees dwarf that overall expense. *See id.* ¶ 77.[1]

2            Though Plaintiffs have addressed the Court's concerns, PayPal submits a 12(b)(6) motion

3    that reads like a summary judgment brief. It invites the Court to prematurely resolve questions that

4    are highly factual—as to market power, pricing, and other matters. These issues cannot properly be

5    adjudicated on the pleadings. The only question is whether the well-pled allegations (accepted as true

6    with all inferences extended) can plausibly support a claim to relief. They do. The 47-page SAC

7    pleads in detail all factual elements of Plaintiffs' claims, with supporting documentation and

8    economic analyses that go far beyond the norm, even in antitrust litigation. Whether Plaintiffs

9    ultimately prevail on their claims is, as always, a matter for another day.  With plausible claims

10   asserted, Plaintiffs respectfully submit that the Court should deny PayPal's motion to dismiss and

11   withhold judgment until a factual record can be developed.

12   ## II.    PROCEDURAL BACKGROUND

13           In November 2025, the Court dismissed Plaintiffs' FAC, without prejudice. *See* ECF No. 79.

14   In doing so, the Court rejected PayPal's overarching challenge to Plaintiffs' proposed relevant

15   market—the eCommerce market—recognizing that PayPal's restraints operate directly in

16   eCommerce "[b]y restraining and dictating prices charged in that market." *Id.* at 6. The Court further

17   relied on precedent upholding "the eCommerce retail market as a relevant product market, citing

18   core differences between it and brick-and-mortar retail markets." *Id.* The Court also rejected

19   PayPal's contention that PayPal must sell goods in eCommerce for it to be the relevant antitrust

20   market for assessing PayPal's restraints. *See id.* at 7.

21           With respect to market power, the Court held that it was appropriate to consider the effect of

22   PayPal's "Anti-Steering Rules in the aggregate" across the market. *See id.* The Court reasoned,

23   however, that Plaintiffs had not sufficiently pled that "PayPal is the dominant payment platform"

24   offering services in eCommerce, and granted Plaintiffs leave to plead additional facts. *See id.* at 8,

25   10. With respect to antitrust injury and standing, the Court declined to apply the co-conspirator

26   exception to *Illinois Brick*, at least absent evidence that PayPal has market power. *See id.* at 9. The

27   _____

28       [1] Plaintiffs also supplemented their CAFA allegations. *See* SAC ¶ 15.

1    Court also reasoned that establishing antitrust standing required that Plaintiffs allege facts addressing

2    the significance of gateway fees vis-à-vis other applicable pricing factors. *See id.* at 10. The Court

3    granted Plaintiffs leave to plead these additional facts. *See id.* at 10.

4          Plaintiffs submitted their SAC on December 12, 2025. As set forth below, the SAC contains

5    additional facts, analysis, and documentation that—coupled with Plaintiffs' existing detailed

6    allegations—lend more than plausible support to each element of Plaintiffs' claims.

                                    **III.    ARGUMENT**

7

8          A plaintiff does not need to prove her case to survive a Rule 12(b)(6) motion. *See Pinnacle*

9    *Armor, Inc. v. United States*, 648 F.3d 708, 721 (9th Cir. 2011). The complaint must only "allege

10   'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.*

11   (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Plausibility is "not akin to a probability

12   requirement" and the task is not to determine whether the claimant is likely to prevail. *Iqbal*, 556

13   U.S. at 678. Instead, the court must credit non-conclusory allegations and draw all reasonable

14   inferences in favor of the plaintiff to determine if this nudges the claims "across the line from

15   conceivable to plausible." *OSU Student All. v. Ray*, 699 F.3d 1053, 1078 (9th Cir. 2012) (citation

16   omitted). If so, the motion to dismiss must be denied.

17   **A.    Plaintiffs Allege Standing.**

18         Courts balance five so-called "*AGC* factors" in determining whether a plaintiff has standing

19   to assert federal antitrust claims—namely, "(1) the nature of the plaintiff's alleged injury; that is,

20   whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury;

21   (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity

22   in apportioning damages." *See Brown v. Amazon.com, Inc.*, 2023 WL 5793303, at *2 (W.D. Wash.

23   Sept. 7, 2023) (citation omitted). No factor is determinative, nor must all factors be present for a

24   plaintiff to have standing. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999).

25         PayPal does not contest the Court's determination that the fourth and fifth *AGC* factors

26   support Plaintiffs' standing. *See* ECF No. 64 at 5-6. PayPal's briefing focuses on the first three

27   factors, which Plaintiffs address in turn.

28

1

**1.      Plaintiffs Allege an Antitrust Injury.**

2

An "antitrust injury" is an injury of the "type" the antitrust laws were meant to forestall. *See,*

3

*e.g.*, *Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 770 (N.D. Cal. 2024). There are

4

four requirements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from

5

that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to

6

prevent." *Am. Ad Mgmt., Inc.*, 190 F.3d at 1055.

7

These requirements are readily satisfied, for pleading purposes, by the SAC's detailed

8

allegations. Plaintiffs allege unlawful conduct: PayPal has entered unlawful agreements with

9

merchants that restrain competition. SAC ¶¶ 2, 37-42. Plaintiffs allege that these agreements cause

10

injuries: supracompetitive prices and diminution in market alternatives. SAC ¶¶ 43-88. Plaintiffs

11

demonstrate at length how these injuries flow from the manner in which the Anti-Steering Rules

12

suppress normal price competition. SAC ¶¶ 107-113. The "higher prices" alleged by Plaintiffs are

13

"exactly the sort [of injury] the antitrust laws aim to prevent." *Copeland*, 716 F. Supp. 3d at 770;

14

*Glen Holly Ent. v. Tektronix, Inc.*, 343 F.3d 1000, 1011 (9th Cir. 2003).

15

PayPal asserts that, to even allege an antitrust injury, Plaintiffs must identify the specific

16

products they bought, the prices they paid, and then model those prices against offerings from

17

merchants that do not accept PayPal. *See* MTD at 6. PayPal cites no case requiring such detailed

18

allegations at the pleading stage. And PayPal confuses the antitrust injury at issue. The overcharges

19

at issue are not product-specific because PayPal's Anti-Steering Rules restrict eCommerce pricing on

20

*all* products. *See* SAC ¶¶ 39-40. As the Court put it, "Plaintiffs' theory of liability does not depend

21

on what products they purchased." ECF No. 70 at 6. Moreover, the relevant price comparison for

22

estimating antitrust injury and overcharges is not *across* merchants, as PayPal would have it.

23

Antitrust damages are measured (at a much later juncture) by comparing the prices charged against

24

the prices that would have prevailed in a hypothetical market free of the challenged restraints (*i.e.*,

25

what antitrust law refers to as the "but for" world). Modelling "but-for world" prices requires

26

discovery and extensive expert analysis. It has never been a pleading burden. *See, e.g.*, *In re Cal.*

27

*Gasoline Spot Mkt. Antitrust Litig.*, 2022 WL 3215002, at *4 (N.D. Cal. Aug. 9, 2022) (rejecting

28

challenge to viability of damages model at pleading stage).

PayPal also suggests in passing that the appearance of lower gateway fees on other payment platforms somehow undermines Plaintiffs' theory of antitrust injury. *See* MTD at 6. The opposite is true. PayPal's Anti-Steering Rules cause harm precisely because they prevent merchants from discounting prices to steer consumers to those lower-cost alternative payment platforms. This insulates PayPal's fees from the normal price competition that would, in the but-for world, drive those fees and resultant retail prices down. *See* SAC ¶¶ 54-63 (gateway fees); *id.* ¶¶ 64-79 (prices).[2]

### 2.    Plaintiffs' Alleged Antitrust Injuries are Direct and Nonspeculative.

#### a.    Plaintiffs Are Direct Purchasers with Standing as Such.

It has long been recognized that direct purchasers have standing to sue for damages under the Clayton Act. *See Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968). In cases involving allegedly anticompetitive agreements, the first purchaser from the agreement's participants—*i.e.*, the "co-conspirators"—is the direct purchaser with standing. This is sometimes called the "co-conspirator exception" to *Illinois Brick*, though it is more aptly described as a "situation in which *Illinois Brick* is simply not applicable." *In re Nat'l Football League Sunday Ticket Antitrust Litig.*, 933 F.3d. 1136, 1157 (9th Cir. 2019). However framed, the rule provides a bright-line test for assessing standing and the directness of a claimants' injuries: the party that purchases from alleged co-conspirators is the party "*directly injured by the violation*." *Id.* at 1158 (emphasis added).

This standing doctrine does not require a covert "conspiracy" or even a voluntary agreement. Whatever circumstances precipitate the allegedly anticompetitive agreement, the first purchaser from the agreeing parties is the "direct" purchaser with antitrust standing to sue. *See Frame-Wilson v. Amazon, Inc.*, 591 F. Supp. 3d 975, 984 (W.D. Wash. 2022) (applying co-conspirator exception and noting that "a conspiracy to [violate the antitrust laws] may exist even where one of the conspirators participates involuntarily or under coercion" (citing *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992))).

---

[2] The "antitrust injury" portion of PayPal's brief also addresses market power and the directness of Plaintiffs' injuries. *See* MTD at 5-6. Plaintiffs respond to these arguments below. *See infra* at § III.A.2(b) (addressing directness of injury) and § II.B.2 (addressing market power).

1    In dismissing the FAC, the Court indicated that these standing principles apply only if one of

2    the co-conspirators has market power to impose the anticompetitive contractual terms at issue. *See*

3    ECF No. 79 at 9. Plaintiffs could not locate any authority adopting this condition on the co-

4    conspirator doctrine, but regardless, it would be satisfied here because, as discussed below, PayPal

5    exercises market power. *See infra* at § II.B.2. The Court further distinguished *Frame-Wilson* on the

6    ground that Plaintiffs, in the Court's view, had not demonstrated "a direct link between the Anti-

7    Steering Rules and retail prices." MTD at 9-10. As detailed in the SAC, the Anti-Steering Rules

8    operate directly on the retail prices eCommerce merchants charge. They do so by literally forbidding

9    eCommerce merchants from discounting retail prices on non-PayPal transactions. *See* SAC ¶¶ 39-40;

10    89 ("PayPal's Anti-Steering Rules operate on retail prices charged within eCommerce"). This type of

11    restraint is known as a "platform most favored nation" clause. *Id.* ¶ 73. It is the same restraint at issue

12    in *Frame-Wilson. See Frame-Wilson*, 591 F. Supp. 3d at 984.

13    **b.    Plaintiffs Allege Causation with Exceptional Specificity.**

14    PayPal does not dispute (for purposes of this motion) that Plaintiffs adequately allege that the

15    Anti-Steering Rules inflate merchant gateway fees. *See* SAC ¶¶ 54-63. The Court likewise did not

16    question the adequacy of Plaintiffs' allegations on this front. ECF No. 79 at 9-10. The issue raised by

17    PayPal's motion and the Court's dismissal Order is whether Plaintiffs sufficiently allege that these

18    inflated gateway fees are absorbed into at least one eCommerce price paid by Plaintiffs. *See id.*;

19    MTD at 7-9.[3] The SAC accomplishes this.

20    As a preliminary matter, it must be emphasized that the relationship between an input cost

21    and an end price is a question of fact,[4] as to which all reasonable inferences must be drawn for (not

22    against) Plaintiffs at this stage. And there are more than sufficient allegations in the SAC to support a

23    plausible inference that Plaintiffs paid at least one inflated price:

24

25    _____

     [3] Contrary to PayPal's motion, Plaintiffs have not "abandoned" their alternative discount theory
     of harm. MTD at 7. Plaintiffs reserve all arguments on that theory.

26    
     [4] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 6709621, at *7 (N.D. Cal. Dec. 26,
27    2012) (holding that whether overcharge at one level of distribution was absorbed into downstream
     prices involved "disputed issues of fact"), *aff'd*, 637 F. App'x 981 (9th Cir. 2016); *see also In re*
28    *Optical Disk Drive Antitrust Litig.*, 2016 WL 467444, at *8-9 (N.D. Cal. Feb. 8, 2016).

- **PayPal's own admissions**: In a regulatory submission, PayPal itself acknowledged that "[p]rocessing payments is, like paying rent and hiring staff, a part of the cost of doing business, and should be absorbed into the final price of goods and services." SAC ¶ 8.

- **Merchant admissions**: Plaintiffs transacted at eCommerce merchants who acknowledged in sworn testimony that payment processing (*i.e.*, gateway) fees are built into the prices they charge. *Id.* ¶ 69. This sworn testimony is confirmed by the largest merchant associations in the country, who report that gateway fees drive up retail prices by "more than $1,000 a year for the average family." *Id.* ¶ 67.

- **Regulators**: The DOJ has found that higher merchant fees lead to "higher retail prices" and an extended study by the Reserve Bank of Australia similarly found that "[t]he prices that merchants charge for goods and services incorporate . . . the cost of payments." *Id.* ¶ 70.

- **Studies across industries**: Economic studies across industries show that costs are incorporated into prices at rates exceeding 70% (often closer to 100%). *Id.* ¶ 71.

- **Studies of merchant fees**: Economists that have focused on the extent to which payment processing fees are built in prices have likewise identified uniformly positive pass-through rates up to 90%. *Id.*

- **Boik & Corts model**: The leading economic model of the pricing effects of PMFNs like PayPal's demonstrates that these restraints "raise fees charged by platforms and prices charged by sellers and that these policies are adopted in equilibrium." *Id.* ¶ 73.

- **Thin margins**: eCommerce merchants typically operate with thin margins, further incentivizing them to adjust prices to reflect changes in gateway fees. *Id.* ¶ 79.

- **Repeat Purchasers:** In addition to purchasing from PayPal-accepting merchants who admittedly bake gateway fees into their prices, each named Plaintiff made at least 50 purchases from PayPal-accepting retailers during the Class Period. *Id.* ¶¶ 18-23; 110. Even if 10% of these merchants' prices were affected by PayPal's inflated gateway fees (a remarkably low estimate), "the probably of someone with 50 transactions being overcharged at least once is 99.5%." *Id.* ¶ 110.

The Court reasoned that these allegations were not enough absent a description of "the significance of the passed-on transaction fees relative to the other numerous pricing factors for any goods or services Plaintiffs allegedly purchased." ECF No. 79 at 10. The SAC contains facts addressing the Court's concerns. Most notably, industry observers recognize that "[t]he overall cost of building and running a new ecommerce website is approximately $29 per month." SAC ¶ 76. PayPal's gateway fees dwarf this "overall cost," as the SAC demonstrates. A retailer doing $10,000 in monthly sales through PayPal will owe PayPal $839 in gateway fees (under PayPal's rack rates),

1    even though the entire cost of building and running the eCommerce storefront could be as low as

2    $29. *See id.* ¶¶ 76-77. The high relative cost of gateway fees (of which PayPal's are particularly

3    high) is also recognized by the largest retail associations in the country, which report that these fees

4    are "most merchants highest operating cost after labor and are too much to absorb, driving up prices

5    paid by shoppers." *Id.* ¶ 76. This is particularly true for the eCommerce business model, which by

6    definition minimizes the labor and overhead costs associated with retail operations. *See id.* ¶ 75.

7            PayPal speculates that fulfillment and shipping costs must factor into the equation (MTD at 9,

8    n.7) but fulfillment and shipping are generally billed separately to the consumer. PayPal further

9    speculates that the Ninth Circuit has identified "other economic inputs" in eCommerce pricing, but

10    the case PayPal cites was discussing the economic inputs for "hotel-room rentals," not eCommerce.

11    *See Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1082 (9th Cir. 2025). Regardless, PayPal cannot

12    rely on extraneous factual assertions in support of a 12(b)(6) motion; the SAC's well-pleaded

13    allegations control.

14            Even if gateway fees were a relatively small input cost, the objective of business cost

15    accounting is to ensure that "all costs, including costs on small ingredients as well as large, are

16    measured and covered by the firm." SAC ¶ 78. That is, businesses do not set prices based on

17    individual cost inputs. They sum all costs and set prices to cover the totality. Thus, if one cost input

18    goes up, total costs go up, and prices must be increased to maintain margins. *See id.* This is not just

19    accounting theory. It is confirmed in the actual pricing practices of the merchants from whom

20    Plaintiffs purchased goods. These merchants testified that they bake gateway fees (in the 2-4%

21    range) into their prices. *See* SAC ¶ 69. As one prominent retailer put it—this is "Econ 101." *Id.*

22    ("[W]e have to pass those costs on to our customers. The customers eventually have to pay . . . we

23    look at our total costs in totality and we go ahead and set retail prices . . . .").

24            Ignoring all of this, PayPal continues to assert that Plaintiffs must show "uniform and

25    consistent impact across all goods or services sold online and across all merchants that sell them."

26    MTD at 8. This is not Plaintiffs' burden. The *extent* of the harm is a classwide damages question to

27    be probed, at the earliest, at class certification. And even at class certification, Plaintiffs do not need

28    to show uniform impact across the entire class. *See Olean Wholesale Grocery Coop., Inc. v. Bumble*

1  *Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022). The question *now* is only whether Plaintiffs have

2  standing. Antitrust standing, like all standing doctrines, focuses on the "*plaintiff's* alleged injury."

3  *Am. Ad Mgmt., Inc.*, 190 F.3d at 1054 (emphasis added). Plaintiffs were injured if they were

4  overcharged on *one* transaction. *In re Nexium Antitrust Litig.*, 777 F.3d 9, 32 (1st Cir. 2015); *see also*

5  *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n.9 (1969) (antitrust plaintiffs must

6  prove "some damage" and injuries after that go to quantum). Based on the totality of Plaintiffs'

7  pleading, including allegations incorporated into the SAC, Plaintiffs adduce more than sufficient

8  facts to establish that they were injured on at least one eCommerce transaction.

9  **B.    Plaintiffs Allege All Elements of a Sherman Act Claim.**

10  **1.    The Court Has Upheld Plaintiffs' Proposed Relevant Market.**

11  Plaintiffs allege that the relevant market for purposes of evaluating PayPal's Anti-Steering

12  Rules is the eCommerce Market. SAC ¶¶ 89-96. In moving to dismiss the FAC, PayPal's principal

13  contention was that eCommerce cannot be a relevant antitrust market. *See* ECF No. 72-1 at 13-16.

14  The Court disagreed, finding "Plaintiffs' proposed product market is facially sustainable" based on

15  various *Brown Shoe* criteria and precedent. *See* ECF No. 79 at 6-7.

16  PayPal "renews its objection," but only in a footnote and without advancing any new

17  contention the Court has not already addressed. *See* MTD at 10, n.9. The Court should uphold

18  Plaintiffs' allegations of a relevant eCommerce market as it previously held.

19  **2.    Plaintiffs Adequately Allege that PayPal Exercises Market Power.**

20  Market power is the ability "to force a contracting partner to do something that he would not

21  do in a competitive market." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 982 (9th Cir. 2023)

22  (brackets omitted). It can be demonstrated with direct evidence, or indirectly through market shares.

23  *See Sheahan v. State Farm Gen. Ins. Co.*, 394 F. Supp. 3d 997, 1010 (N.D. Cal. 2019).

24  Importantly for present purposes, market power need not be "pled with specificity," *In re*

25  *Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 993 (N.D. Cal. 2010), and "the existence or non-

26  existence of that market power is a factual question," *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d

27  1038, 1052 (9th Cir. 2008). "Dismissals for insufficient pleading of market power are rare pre-

28  discovery and are generally reserved for complaints bereft of factual allegations or which contain

market share or market power allegations that are purely conclusory." *Off. Cantonal des Faillites de la Republique et du Canton de Geneve v. Expedia, Inc.*, 2024 WL 381181, at *9 (W.D. Wash. Feb. 1, 2024) (citation omitted).

Here, PayPal's market power can be established directly based on its ability to enforce Anti-Steering Rules across the market restricting the pricing freedom of thousands of contracting partners, including many of the largest eCommerce retailers in the country. As alleged in the SAC, over "82% of the top 1,000 online retailers in North America, and 940,000 U.S. websites overall accept PayPal." SAC ¶¶ 36, 100. Another study estimates that 73.9% of all retailers accept PayPal. *Id.* ¶ 100. Each and every one of these retailers has acceded to PayPal's Anti-Steering Rules and PayPal's industry high transaction fees. *Id.* As the SAC observes, "merchants can free themselves from the Anti-Steering Rules only by not accepting PayPal as a means of payment . . . [b]ut demonstrably few eCommerce merchants have done so." *Id.*

A firm that can broadly impose economic restraints on contracting parties, by definition, has market power. This is widely recognized in the caselaw PayPal ignores. *See Epic Games*, 67 F.4th at 982 (market power is the ability "to force a contracting partner to do something he would not do in a competitive market" (brackets omitted)); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 99 (E.D.N.Y. 2024) (MasterCard's ability to broadly force merchants to accept MasterCard and its "Honor All Cards rules . . . is also direct evidence of market power").[5]

PayPal contends that Plaintiffs must allege PayPal's share of transactions to plead market power. *See* MTD at 12. There is no such requirement. Market share is only an *in*direct means of proving market power, and there is no need to prove market power indirectly where, as here, direct proof exists. *See Epic Games*, 67 F.4th at 998 (recognizing that market power and monopoly power "can be established either directly or indirectly").

Moreover, the appropriate "share" to consider here is the share of merchants accepting

---

[5] *See also United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 340 (S.D.N.Y.) (market power established by evidence that merchants "cannot refuse to accept Visa and MasterCard" as a means of payment), *modified*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003).

PayPal. *See* SAC ¶ 100. This is because the Anti-Steering Rules are imposed as a condition of PayPal acceptance, and once accepted, the restraints govern merchants' pricing across *all* transactions, not just those processed by PayPal. Put differently, the relevant "market power" question is whether merchants have the practical ability to evade, and thereby discipline, PayPal's Anti-Steering Rules. Merchants cannot do this by shifting transactions away from PayPal. Merchants can only escape the Anti-Steering Rules by ceasing to accept PayPal entirely—and remarkably few merchants have done so given PayPal's overwhelming popularity with consumers. Dropping PayPal as a payment option means losing customers loyal to PayPal, and that is a significant source of PayPal's market power. *See* SAC ¶¶ 36, 100.

PayPal claims that it is somehow improper to consider all PayPal accepting merchants when assessing PayPal's market power. As PayPal would have it, each PayPal merchant agreement must be assessed in a vacuum, without regard to the totality of the market PayPal's agreements cover. *See* MTD at 13. This makes no sense, and it is contrary to the Court's Order and decades of precedent. In *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291 (9th Cir. 1982), the Ninth Circuit held that the district court properly "aggregated other contracts in the relevant market." *Id.* at 1302.[6] The Court reasoned that the focus must be on "the overall effects of a defendant's conduct in the relevant market." *Id.* This Court relied on *Twin City* and its progeny to squarely reject PayPal's anti-aggregation argument. *See* ECF No. 79 at 7-8.

PayPal contends that the Ninth Circuit overruled *Twin City*, sub silentio, in *Gibson v. Cendyn Group, LLC*, 148 F.4th at 1087. This is not a sustainable interpretation of *Gibson*. In *Gibson*, the Ninth Circuit held only that the plaintiffs there failed to allege that the agreements "at issue restrained competition in the relevant market at all." *Id.* The court reasoned that the hotel operators' agreements with the pricing vendor could not affect market-wide pricing because there was no allegation that the hotels agreed to follow the vendor's pricing recommendations. Absent any restraint on the hotels' independent pricing discretion, the court concluded that the agreements could

---

[6] *See also William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 561 F.3d 1004, 1010 (9th Cir.), *opinion withdrawn on other grounds*, 588 F.3d 659 (9th Cir. 2009); *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1361 (N.D. Cal. 2013).

1    not be aggregated to state a Sherman Act claim. *See id.*  That reasoning does not apply here. PayPal's

2    Anti-Steering Rules restrain trade in the relevant eCommerce market by dictating the retail prices

3    merchants may charge for eCommerce transactions. SAC ¶¶ 37-44; ECF No. 79 at 6. Operating

4    under those rules, each PayPal-accepting merchant is prohibited from offering lower eCommerce

5    prices when customers use non-PayPal payment methods. Because these restraints operate across the

6    same relevant antitrust market and directly constrain pricing, it is not only appropriate but necessary

7    to evaluate their aggregate anticompetitive effects. *See Gibson*, 148 F.4th at 1087; *see also supra*

8    fn. 6 (collecting cases); ECF No. 79 at 7-8 (same).

9        PayPal also focuses on the Court's holding that Plaintiffs must incorporate "allegations about

10    PayPal's rival platforms" to plead market power. *See* ECF No. 79 at 8. The SAC does this. Studies

11    show that PayPal continues "*to dominate the market for online payment processing," appearing on*

12    *twice as many domains as its nearest competitor (Stripe)*. *See* SAC ¶ 101 (emphasis added). PayPal

13    quibbles that this study is global, but PayPal ignores other allegations confirming that PayPal's

14    dominance extends into the United States. *See* SAC ¶ 36 (82% of top North American retailers

15    accept PayPal, and "940,000 U.S. websites overall"); *id.* (listing large merchants that accept

16    PayPal—all U.S. companies); ¶ 101 ("In the United States in particular, 'PayPal is the most popular

17    digital wallet among [] adults with a 71% penetration rate." (alteration in original)). These

18    allegations are more than adequate at this stage, prior to any discovery, particularly because market

19    power is a factual element that need not even be "pled with specificity." *In re Webkinz Antitrust*

20    *Litig.*, 695 F. Supp. 2d at 993.

21        Moreover, although not required by the Court's dismissal Order, Plaintiffs also

22    prophylactically defined a separate market for eCommerce Payment Processing Services, which

23    PayPal provides. *See* SAC ¶¶ 104-106.[7] The SAC defines this market in accordance with the well-

24

25        _____

26        [7] To be clear, the relevant antitrust market for evaluating the *anticompetitive effect* of PayPal's
        restraint is the eCommerce market, as set forth in the SAC and the Court's Order upholding
        Plaintiffs' allegations of a relevant eCommerce market. *See* ECF No. 79 at 5-7. Plaintiffs define a
27        market for eCommerce Payment Processing Services only in case the Court finds it profitable in
        evaluating the source of PayPal's market power to impose the Anti-Steering Rules on eCommerce
28        merchants.

established *Brown Shoe* factors and elasticity of demand. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (observing that "practical indicia" of a relevant market include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors"); SAC ¶ 104 (addressing *Brown Shoe* factors and explaining why "there are no reasonable substitutes for eCommerce payment processing").

As the Court observed, PayPal previously faulted Plaintiffs for not defining a "market for on-line payment platforms." ECF No. 79 at 7. PayPal cannot now backtrack and claim there is no such thing. But that is what PayPal asserts. *See* MTD at 11. In doing so, PayPal does not engage any of the *Brown Shoe* factors, and PayPal's only concrete criticisms are wildly off base. Mainly, PayPal contends that market definition cannot evaluate the nature of a product's users. *See* MTD at 10-11. The Supreme Court, however, has held otherwise. *See Brown Shoe*, 370 U.S. at 325 (one indicia of a relevant market is "distinct customers").

### 3. PayPal's Anti-Steering Rules Have Demonstrable Anticompetitive Effects.

PayPal continues to overreach by contending that the Court should deem its Anti-Steering Rules procompetitive as a matter of law prior to any discovery. *See* MTD at 14-15. This is not remotely appropriate. For one, the anticompetitive effect of PayPal's challenged restraints, and any countervailing procompetitive justifications PayPal may offer, are factual questions that a "district court cannot resolve on the pleadings." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 839 (9th Cir. 2022); *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 601 (N.D. Cal. 2020). And anticompetitive effects are not just well-pled in the SAC—they are well-established in the caselaw upholding antitrust claims challenging the Visa and MasterCard anti-steering rules on which PayPal's are modeled. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d at 95 (finding "sufficient direct evidence of anticompetitive effect" to defeat summary judgment, including that anti-steering rules generated supracompetitive prices, reduced output, and otherwise "stifled competition"); *see also Osborn v. Visa Inc.*, 797 F.3d 1057, 1066 (D.C. Cir. 2015) (upholding allegations that anti-steering rules imposed on ATM operators "insulate their networks from price competition from other networks" resulting in higher ATM surcharges to consumers);

1

2

*Nat'l ATM Council, Inc. v. Visa Inc.*, 2023 WL 4743013, at *7 (D.C. Cir. July 25, 2023) (certifying consumer classes challenging same).

3

4

5

6

7

8

9

PayPal addresses neither this precedent nor the SAC's factual allegations. Instead, it attempts to incorporate its prior briefing by reference. This is not permitted. *See In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 3648478, at *24 (N.D. Cal. July 7, 2016) (sustaining objection to briefing incorporated by reference as improper attempt to circumvent page limits).[8] PayPal's only new argument is premised on PayPal's misreading of *Gibson*, 148 F.4th at 1087, which Plaintiffs address above. Simply put, *Gibson* does not require that courts ignore the market-wide effects of a restraint in considering whether it is anticompetitive.

10

**C.    PayPal Has Not Identified Any Grounds on Which to Dismiss Plaintiffs' State Law Claims.**

11

12

13

14

15

16

17

18

19

20

21

22

PayPal does not dispute that the Court has CAFA jurisdiction to adjudicate Plaintiffs' state law claims. Indeed, it barely addresses Plaintiffs' state law claims, supplying no basis on which the Court could dismiss them.[9] PayPal appears to presume that the consumer protection laws Plaintiffs invoke are coterminous with the Sherman Act, such that if Plaintiffs' Sherman Act claim is dismissed, the state law claims must be dismissed as well. This is incorrect. Plaintiffs rely on state laws proscribing "unfair" business practices. PayPal has not identified a single authority suggesting that a Sherman Act violation is a prerequisite to pleading an "unfair" business practice under any consumer protection law. As the Ninth Circuit recently emphasized, "a business practice may be 'unfair,' and therefore illegal under the UCL, 'even if not specifically proscribed by some other law.'" *Epic Games*, 67 F.4th at 1000 (citation omitted) (affirming plaintiff judgment under UCL even though Sherman Act claim failed); *see also Cent. Valley Med. Grp., Inc. v. Ind. Phys. Assocs.*

23

24

25

26

---

[8] If PayPal is permitted to incorporate prior briefing, Plaintiffs likewise incorporate by reference their prior briefing on anticompetitive effects. *See* ECF No. 73 at 15-17.

27

28

[9] Plaintiffs assert consumer protection and other claims under the laws of California, Florida, Minnesota, North Carolina, and Oregon.  *See* SAC ¶¶ 114-161.

1 | *Med. Grp., Inc.*, 2019 WL 3337891, at \*4 (E.D. Cal. July 25, 2019).[10] Plaintiffs' state law claims

2 | should be upheld.

### IV.    CONCLUSION

The Court should deny PayPal's Motion to Dismiss the SAC in its entirety.

DATED: January 30, 2025.                    Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By */s/ Ben M. Harrington*
   Ben M. Harrington (SBN 313877)
   Abby R. Wolf (SBN 313049)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
benh@hbsslaw.com
abbyw@hbsslaw.com

Barbara A. Mahoney (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
barbaram@hbsslaw.com

Brian D. Clark (*pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
bdclark@locklaw.com

---

[10] PayPal attempts to incorporate by reference its prior briefing on Plaintiffs' state law claims, but even if this expansion of pages were appropriate, PayPal's prior briefing was equally conclusory (contained in a single paragraph). *See* ECF No. 72-1 at 20. If PayPal is permitted to incorporate prior briefing, Plaintiffs likewise incorporate by reference their prior briefing on the state-law claims. *See* ECF No. 73 at 19-20.

Stephen J. Teti (*pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN PLLP**
265 Franklin St., Suite 1702
Boston, MA 02110
Telephone: (617) 456-7701
sjteti@locklaw.com

*Attorneys for Plaintiffs and the Proposed Class*